**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

American Premier Underwriters Inc.,

     Plaintiff,

     v.                             Case No. 1:05cv437

General Electric Company,                Judge Michael R. Barrett

     Defendant.

## OPINION & ORDER

This matter is before the Court on Defendant General Electric Company's Motion for Summary Judgment on Statute of Limitations Issues (Doc. 91). Plaintiff American Premier Underwriters, Inc. ("APU") has filed a Response in Opposition (Doc. 106), and General Electric filed a Reply (Doc. 143).

## I.    BACKGROUND

Plaintiff American Premier Underwriters, Inc. ("APU") is the successor to the Penn Central Transportation Company ("Penn Central"). This action arises from contamination at four rail yards operated by Penn Central prior to April 1, 1976: (1) the Paoli Yard, located in Paoli, Pennsylvania; (2) the South Amboy Yard, located in South Amboy, New Jersey; (3) Sunnyside Yard, located in Long Island, New York; and (4) Wilmington Shops and related facilities, located in Wilmington, Delaware. During the period when Penn Central operated these rail yards, it owned and used passenger rail cars with transformers manufactured by GE. APU claims the GE transformers contaminated the rail yards by leaking polychlorinated biphenyls ("PCBs").

APU filed the instant action against GE on June 24, 2005. This Court previously

dismissed Count II; Counts XI through XIX (insofar as they are based on Pennsylvania law); Count XX; and Count XXI of APU's complaint. The remaining claims are as follows: Count I – cost recovery and declaratory relief under CERCLA § 107(a); Count III – contribution and declaratory judgment under CERCLA § 113(f); Count IV – contractual indemnification relating to the Silverliner IV cars; Count V – contractual indemnification relating to the Jersey Arrow II cars; Count VI – cost recovery under the Pennsylvania Hazardous Sites Cleanup Act ("PHSCA"); Count VII – contribution under the PHSCA; Count VIII – cost recovery under the New Jersey Spill Act; Count IX – contribution under the New Jersey Spill Act; Count X – contribution under the Delaware Hazardous Substances Cleanup Act; Count XI – trespass under New York, Delaware and New Jersey law; Count XII – negligence under New York, Delaware and New Jersey law; Count XIII – private nuisance under New York, Delaware and New Jersey law; Count XIV – public nuisance under New York, Delaware and New Jersey law; Count XV – abnormally dangerous activity under New York, Delaware and New Jersey law; Count XVI – strict liability under New York, Delaware and New Jersey law; Count XVII negligent design under New York, Delaware and New Jersey law; Count XVIII – negligent manufacture under New York, Delaware and New Jersey law; Count XIX – failure to warn under New York, Delaware and New Jersey law; Count XXII – punitive damages; and Count XXIII assignment of Conrail, SEPTA and Contrail's claims.

GE seeks to dismiss these remaining claims as being barred by the applicable statutes of limitations.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving part has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id*. at 252.

The parties do not dispute the facts which are relevant to deciding the applicability of the statute of limitations, therefore deciding the issue upon a motion for summary judgment is appropriate.

## III.   ANALYSIS

### A.   Recovery of costs under CERCLA

In Counts I and XXII, APU brings claims pursuant to section 107(a) of the Comprehensive Environmental Response and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). The applicable statute of limitations is found in section 113(g)(2), 42 U.S.C. § 9613(g)(2):

(2) Actions for recovery of costs

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--

(A) for a removal action, within 3 years after completion of the removal

action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). Therefore, if the action taken is "remedial," the statute runs from "initiation of the physical on-site construction." If the action taken is "removal," the statute runs from "completion of the removal action." The term "removal" is defined in the Act as follows:

The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

42 U.S.C. § 9601(23) (footnote omitted). The term "remedial" is defined as follows:

The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and

-4-

associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24) (footnote omitted). The classification of whether the activity was a removal action or a remedial action is determined as a matter of law and can be determined on summary judgment. *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F.Supp.2d 821, 837 (S.D.Ohio 2002). As a general matter, removal actions cost less, take less time, and are geared to address an immediate release or threat of release of a hazardous substance. *Id.* at 833. In contrast, remedial actions are usually permanent responses that address more extraordinary environmental dilemmas. *Id.*

GE argues that APU cannot recover remedial costs because physical onsite construction of the remedy at each site began before June 24, 1999 and the removal action concluded prior to June 24, 2002.

APU argues that its claims for remedial costs are timely because (1) no physical on-site construction of remedial work at the sites commenced more than six years before APU filed the complaint on June 24, 2005; (2) all removal work was completed less than three years before commencement of physical on-site construction of those remedial actions; and (3) removal work has not yet been completed at the Sunnyside Yard and

-5-

Wilmington Yard sites.  APU argues that its claims for removal costs are timely because the removal actions at each site did not conclude until at least June 24, 2002, or until a date that is less than three years before commencement of physical on-site construction of the applicable remedial action.

## 1. Remedial action at Paoli Yard

As way of background, the United States filed a federal action in Pennsylvania on February 25, 1986 against SEPTA, Amtrak, and Conrail seeking recovery of the costs it incurred to address the contamination at the Paoli Rail Yard.[1]  SEPTA, Amtrak, and Conrail named APU as a third-party defendant in that action on August 12, 1992.  On October 23, 1992, the United States filed a similar action against APU in the same court.

Beginning in 1986, the government entered into a series of five partial preliminary consent decrees and a worker protection stipulation with SEPTA, Amtrak and Conrail. Under the consent decrees and the stipulation, SEPTA, Amtrak and Conrail agreed to perform a variety of activities to begin clean up at the Paoli Yard site.  SEPTA, Amtrak and Conrail ("Rail Companies") spent approximately $12 million on clean up before entering into a settlement agreement with the government and the final consent decree was entered.

GE argues that remedial action began at the Paoli Yard with a fuel oil remedy, which was initiated in 1990 and was fully operational in 1992.[2]  The fuel oil remedy consisted of

---

[1]These background facts are taken from written opinions in that case.  The district court rejected APU's challenge to the consent decree that resolves the liability of Conrail, Amtrak, and SEPTA for the contamination at the Paoli site, *U.S. v. SEPTA*, 1999 WL 199659 (E.D. Pa. 1999), and the Third Circuit affirmed.  235 F.3d 817 (3d. Cir. 2000).

[2]APU does not dispute that the fuel oil remedy commenced in 1990.

ground water pumps to recover PBC-infused oil from ground water.  GE points to the U.S.

Environmental Protection Agency's ("EPA") July 21, 1992 Record of Decision ("ROD"),

which included the fuel oil remedy as part of the final selected remedial action for the Paoli

Yard.

APU's first response is that the fuel oil remedy did not trigger the statute of

limitations for remedial cost recoveries because it preceded the remedial investigation and

feasibility study ("RI/FS") for the site.[3]

This Court has expressly declined to adopt a "bright line" rule under which the formal

adoption of a final remedy is the cutoff between "removal" and "remedial" action.  *Cytec*,

232 F.Supp.2d at 837.  As this Court has pointed out, there is no support in the statute for

the rule that remedial action cannot begin until the EPA or another lead agency issues a

final, written approval of the remedial design for the site.  *Id*. at 838.  This Court has

explained that such a rule would "lead to the absurd result that actions brought by private

parties to recover response costs in which no governmental agency was involved in the

cleanup could never be classified as remedial actions because no lead agency would ever

issue a final plan for the permanent remedy."  *Id*.; *see also State of Cal. on Behalf of*

*California Dept. of Toxic Substances Control v. Hyampom Lumber Co.*, 903 F.Supp. 1389,

1392-93 (E.D.Cal. 1995) (rejecting proposition that remedial activity could not begin prior

to final approval of permanent remedy because "[t]his would make the lengthy definition

---

[3]The regulations provide that "[t]he purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives."  40 C.F.R. § 300.430(d).  "The primary objective of the feasibility study (FS) is to ensure that appropriate remedial alternatives are developed and valuated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected."  40 C.F.R. § 300.430(e).

of 'remedy' and 'remedial action' appearing in § 9601(24) meaningless—the terms would simply be defined as all response activities which occur after final approval of the permanent plan."). Therefore, actions taken before the RI/FS and the final plan was approved by the EPA may constitute remedial action.

Next, APU argues that the fuel oil treatment system put in place in 1990 cannot be considered as a remedial action because it was taken out of service in order to implement the final remedial plan. In support of its position, APU cites to the Sixth Circuit's decision in *GenCorp v. Olin Corp*., 390 F.3d 433 (6th Cir. 2004), *cert. denied*, 546 U.S. 935 (2005).

In *GenCorp*, the Sixth Circuit held that the limitations period for a contribution claim under CERCLA was not triggered when the plaintiff added topsoil and clay to prevent soil erosion and changed the landfill's slope gradient. *Id.* at 443-44. The Sixth Circuit explained that "[t]he salient point here is that CERLCA's definition of 'remedial action' encompasses only 'those actions *consistent with [the] permanent remedy taken* . . . to prevent or minimize the release of hazardous substances,' and unless a 'remedial action' meeting this requirement has begun, the statute-of-limitations-triggering event cannot occur." *Id.* at 444 (quoting 42 U.S.C. § 9601(24) and adding emphasis and alteration). The court concluded that the topsoil and clay were an "interim measure" that was "inconsistent with the federal EPA's remedial plan." *Id.*

As GE points out, the EPA's ROD for the Paoli site was issued on July 21, 1992 and states: "This decision document presents the final selected remedial action for the Paoli Rail Yard Site." (Doc. 143-1.) The ROD selects "continued implementation of the fuel oil recovery and ground water treatment program and ground water monitoring" as a

component of the final remedy. (Id. at 35.) Therefore, the ROD makes it clear that fuel oil treatment system was not only consistent with the permanent remedy, but was a part of the permanent remedy. APU does not necessarily dispute this conclusion, but instead argues that the remedy was not permanent because it was taken out of service in August of 2001. GE, citing the EPA's May 6, 2006 Five Year Review Report, argues that while particular wells may have been dismantled, there were wells which continued to operate until approximately May 2006. The Report explains:

> Active fuel oil recovery on the rail yard began in September 1990. Initially, the recovery system included three pumping wells. To increase the volume of oil removed, two additional recovery wells were installed in June 1995. From 1990 through 2003, the system recovered approximately 778 gallons of fuel oil. Through 2004, more than 11 million gallons of groundwater was treated and discharged to an on-site underground infiltration gallery. Due to reductions in the amount of oil recovered, active oil recovery has recently been discontinued. However, the wells continue to be monitored for the presence of oil. If present, oil will be manually removed from the wells. If necessary, based on results of the groundwater monitoring program, active fuel oil recovery may resume.

(Doc. 143-2, at 18.) It is clear from the Report that the fuel oil remedy consisted of a number of wells, and the wells were in operation after they were taken out of service in August of 2001. The Court finds that the temporary shut down of the wells for construction does not change the permanent nature of the fuel oil remedy.

Finally, APU argues that the plain language of the Remedial Design/Remedial Action ("RD/RA") Consent Decree between EPA and the Rail Companies makes it clear that construction of the remedial action did not, and could not, commence until May 2001, after the Rail Companies satisfied EPA's conditions precedent to constructing the remedy.[4]

---

[4]According to the regulations, "[t]he remedial design/remedial action (RD/RA) stage includes the development of the actual design of the selected remedy and implementation of

The Court finds that this argument is a variation on the "bright line" rule argument. APU has not identified any physical difference between the system which was in place before May 2001, and the system in place after that date. The only change identified is a final approval by the EPA. For the reasons stated above, and stated in *Cytec*, 232 F.Supp.2d at 838, this Court declines to adopt a cutoff based on the formal adoption or commencement of a final remedy.

Based on the foregoing, the Court finds that the fuel oil treatment system at the Paoli site was a remedial action which began in 1990. Therefore, APU's claim for remedial costs, brought in 2005, is outside the six-year statute of limitations under CERCLA.

### 2. Remedial action at Sunnyside Yard

GE argues that the physical onsite construction of a fuel oil remedy began at Sunnyside Yard in 1990.[5] APU counters that the remedial action at Sunnyside Yard did not commence until after APU filed this action.

APU explains that Sunnyside Yard is divided into several distinct operable units ("OUs"), each of which is or will be the subject of its own ROD, which will, in turn, govern the remedial actions to be undertaken at those OUs. APU argues that each OU should be subject to their own distinct statute of limitations. In response, GE explains that the Sunnyside Yard is an active railroad in New York City, and it was divided into OUs merely because the entire site could not be shut down to clean it. GE argues that the Sunnyside Yard should be considered as one "facility" for purposes of the statute of limitations.

---

the remedy through construction." 40 C.F.R. § 300.435.

[5]This remedy consisted of three recovery sumps connected to a series of gravel-packed trenches to intercept and recover oil. (Doc. 91-4, at 2.)

CERCLA defines the term "facility" as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9). This Court has explained that "usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management." *Cytec*, 232 F.Supp.2d at 836. The Sixth Circuit has explained that:

> The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination. . . . However, an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single "facility," even if it contains parts that are non-contaminated.

*United States v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998) (citing Clear Lake Properties v. Rockwell Int'l Corp., 959 F.Supp. 763, 767-68 (S.D.Tex. 1997)). Accordingly, the Sixth Circuit has found that three legally-separate parcels of land should be treated as one "facility" because "[t]here [was] no evidence in the record that the parcels were, at any relevant time, considered separate for any purpose other than the land records." *U.S. v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000).

The Court concludes that the OUs in this case are not subject to their own distinct statute of limitations. *Accord New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F.Supp.2d 417, 511 (N.D.N.Y. 2011) (finding "persuasive those cases in which courts have concluded that regardless of the number of operating units at a site, there can be only one

remedial action for any given facility.") (citing Yankee Gas Servs. Co. v. UGI Utilities, Inc., 616 F.Supp.2d 228, 270 (D. Conn. 2009)).  OU divisions of a site may or may not correspond to the geographic bounds of the "facility," as that term is defined in CERCLA. As the applicable regulations explain:

> Operable unit means a discrete action that comprises an incremental step toward comprehensively addressing site problems.  This discrete portion of a remedial response manages migration, or eliminates or mitigates a release, threat of a release, or pathway of exposure.  The cleanup of a site can be divided into a number of operable units, depending on the complexity of the problems associated with the site.  Operable units may address geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site.

40 C.F.R. § 300.5.

APU identifies OU-3, OU-4, and OU-5 as those which it seeks to recover remedial costs from GE.  The New York Department of Environmental Conservation's ("NYDEC") March 30, 2007 ROD for OU-3 describes OU-1 as addressing the soil above the water table within the footprint of the High Speed Trainset Facility Service and Inspection Building.  (Doc. 114-3, at 10.)  OU-2 addresses the soil above the water table within the footprint of the ancillary structures for the same building.  OU-3 addresses eight acres in the north central portion of the Yard.  OU-4 is described in the same document as the soil above the water table in the areas of the Yard outside OU-1, OU-2, and OU-3.  (Id.)  OU-5 addresses the sewer system beneath the Yard.  (Id.)  OU-6 addresses the saturated soil and the groundwater beneath the Yard.  The ROD explains that the portion of the sewer and groundwater that lies within the OU-3 boundary will be addressed as part of OU-5 and OU-6.  (Id.)

Therefore, with the exception of OU-5 and OU-6, each of the OUs address a

specific geographic area within the Yard. It appears that this division of the work in OUs was not put into place until approximately March of 1997. (See Doc. 91, Ex. F.) The "Work Plan for the Phase III Interim Remedial Measure System in Operable Unit 4," authored by Roux Associates, explains: "During a recent meeting at the NYSDEC, the complex nature of concerns at the Yard was discussed with regard to completion of the RI/FS. The concept of separate, manageable units (operable units) to systematically address concerns was discussed and accepted."). (Id.)[6]

The Court finds no reason in this case to stray from defining the Sunnyside site in geographic terms, as opposed to the divisions made by the NYDEC for purposes of managing remedial activies.[7] APU has not proposed that the site can be "reasonably or

_____

[6]Roux Associates, Inc. conducted the Remedial Investigation, which was undertaken in accordance with the March 14, 1989 Work Plan. (Doc. 91, Ex. E.) This Work Plan was prepared in accordance with the provisions of the Order on Consent between NYSDEC, Amtrak and New Jersey Transit Corporation. (Id.)

[7]This determination is in keeping with the underlying purposes of CERCLA. As this Court has explained:

> This court concludes that, where appropriate, the broadest geographical definition of a facility that is appropriate under the specific facts and circumstances of a given case would likely best advance CERCA's two underlying purposes—to ensure prompt and efficient cleanup of hazardous wastes sites and to place the costs of those cleanups on the potentially responsible persons. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1416–17 (6th Cir.1991). This approach serves CERCLA's two primary purposes because it avoids piecemeal litigation, encourages a comprehensive remedy which is co-extensive with the entire geographical area affected by a release or threatened release of hazardous substances, and promotes the concept of strict liability which CERCLA incorporates. Put differently, issues relating to respective liability can best be determined in one litigation, and therefore the definition of facility should be the most geographically complete definition that is appropriate under the circumstances of a given case.

*Cytec*, 232 F.Supp.2d at 835-36. However, in *U.S. v. Manzo*, 182 F.Supp.2d 385, 403 (D.N.J. 2000), the court noted: "By permitting the United States to bring cost recovery actions based on the timing of each ROD and operable unit, the Court would be honoring CERCLA's two principal goals of facilitating the cleanup of potentially dangerous hazardous waste sites and requiring

naturally divided" based on any geographic features.[8]  Therefore, Sunnyside Yard is a single facility for purposes of the statute of limitations under CERCLA.

APU next argues that the physical on-site construction of the NYDEC's selected remedy could not have commenced until after the NYDEC selected the remedy for each OU.  APU explains that the physical on-site construction of the remedial action at each of these OUs commenced within the six-year statute of limitations, or in the case of OU-5, will commence in the future.  However, APU also acknowledges, like the Paoli Yard site, a fuel oil remedy was initiated at the Sunnyside Yard site in 1990.[9]  As discussed above, the Court declines to adopt a "bright line" rule for purposes of determining the commencement of the statute of limitations.

Based on the foregoing, the Court finds that the fuel oil recovery system at the Sunnyside Yard site was a remedial action which began in 1990.  Therefore, APU's claim for remedial costs, brought in 2005, is outside the six-year statute of limitations under CERCLA.

### 3. Remedial action at Wilmington Yard

---

polluters to pay the costs of their pollution."  This Court is not unmindful of the conflict between this decision and its own.  By way of explanation, this Court notes that the United States was the plaintiff in *Manzo*, and the court there properly invoked the judicial presumption that a statute of limitations should be "construed in favor of the United States to avoid hindering important public rights and policies."  182 F.Supp.2d at 401.

[8]A map of the yard location is included in the NYDEC's March 30, 2007 ROD for OU-3. (Doc. 114-3, at 39.)  While the map is not entirely legible, it shows that the yard is a enlongated area which encompasses the tracks which enter and exit the yard.  The ROD describes the site as being 133 acres and bordered by commercial/residential properties.  (Id. at 10.)

[9]This remedy consisted of three recovery sumps connected to a series of gravel-packed trenches designed to intercept oil.  (Doc. 91, Ex. D.)  CERCLA identifies the installation of trenches for "collection of leachate and runoff" is an example of a type of remedial action.  42 U.S.C. § 9601(24).

GE argues that APU has engaged in remedial action at the Wilmington Yard since 1996 with oil booms, and since 1998 with a fuel recovery system.

APU responds that the mere placement of oil recovery booms at Wilmington Yard should not be considered a remedial action. Citing this Court's decision in *Cytec*, APU argues that the term "construction" for purposes of determining when physical on-site construction occurs, "'ordinarily connotes the creation of something that did not exist before, rather than the repair or cleansing of something that already exists.'" 232 F.Supp.2d at 840 (quoting Hyampom Lumber, 903 F. Supp. at 1392). The Court finds it unnecessary to conduct any analysis on this point, because GE does not dispute that there was a fuel oil recovery system in place beginning in 1998.[10]

APU responds that the fuel oil recovery work at Wilmington Yard was not, and could not be, a remedial action because the RI/FS work for the former fueling facility has yet to be completed to this day. APU also explains that the Delaware Department of Natural Resources and Environmental Control has not yet issued a proposed remedial action plan or a ROD for the site. The Court again declines to adopt a "bright line" rule for purposes of determining the commencement of the statute of limitations.

Based on the foregoing, the Court finds that the fuel oil recovery system at the Wilmington Yard site was a remedial action which began in 1998. Therefore, APU's claim for remedial costs, brought in 2005, is outside the six-year statute of limitations under CERCLA.

---

[10]Like the fuel oil recovery system at Sunnyside, the system at Wilmington consisted of trenches. These trenches were identified in the Remedial Investigation Work Plan as the "Presumptive Remedy." (Doc. 91, Ex. I.)

## 4. **Remedial action at South Amboy**

GE argues that APU cannot assert a claim for remedial costs at South Amboy Yard because APU never incurred direct costs at that site. APU does not dispute this contention, and recognizes that this Court previously dismissed APU's claim for reimbursement costs brought under section 9607 of CERCLA. (See Doc. 60, at 16.) Accordingly, GE is entitled to summary judgment on Count I, to the extent that APU's claim under section 9607 is based upon direct costs incurred at South Amboy. However, APU still may maintain a section 9613 contribution claim based on costs incurred at the South Amboy Yard.

The Court notes at this juncture that because it has concluded that none of the remedial actions are timely, it is unnecessary to address APU's claim for removal costs as part of a remedial action claim. *See Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 223 (3d Cir. 2010) (noting that the § 9613(g)(2)(B) exception permitting recovery of removal costs during a remedial action suit applies when the remedial action suit is brought "'within 6 years after [the] initiation of physical on-site construction of the remedial action,' *and* the remedial action must be initiated within three years after the completion of the removal action.").[11] Therefore, the Court will now address whether APU's claims for removal costs are timely.

_____

[11]The Court notes that this conclusion contradicts *dicta* found in the Sixth Circuit's opinion in *Kelly v. E.I. DuPont De Nemours and Co.*, 17 F.3d 836 (6th Cir. 1994). There, the Sixth Circuit found that it was not necessary to reach the State of Michigan's argument that its claim should be considered under the alternative limitations period found in section 9613(g)(2)(B). *Id.* at 844. However, the Court commented that "it is reasonable to conclude that the State could have proceeded under CERLA's alternative limitations period for remedial actions, having commenced its remedial monitoring activity within three years of the date [removal activity was complete]." *Id.*

### 5.    Removal action at Paoli Yard

GE argues that the removal action at the Paoli Yard was complete by 1988. APU counters that the removal actions at Paoli could not have been completed before (1) the EPA approved the RD/RA in the Fall of 2000; (2) soils in the interim containment cell required by the Fifth Partial Preliminary Consent Decree were treated during the remedial action; and (3) the ongoing inspection and maintenance of the security fence and fabric filter that was required by the First Partial Consent Decree could be performed in conjunction with the remedial action after May 2001.

As to the date that the EPA approved the RD/RA, the Court again declines to adopt a "bright line" rule which would demarcate the approval of the RD/RA as the trigger for the commencement of the statute of limitations. *Accord Cytec*, 232 F.Supp.2d at 838.

As to the argument that removal actions are ongoing at the Paoli Yard, GE replies that this argument ignores the distinction between "removal" and "remedial" actions.

As a general matter, the Sixth Circuit has explained that removal actions are frequently temporary solutions to emergency situations. *See Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 540 n.3 (6th Cir. 2001) ("Removal actions . . . usually occur in the context of an emergency, and are considered temporary solutions."); *Barmet Aluminum Corp. v. Reilly*, 927 F.2d 289, 291 (6th Cir. 1991) ("Removal refers to short-term action taken to halt any immediate risks posed by hazardous wastes.").

However, the Sixth Circuit has also instructed that the term "removal action" should be given broad interpretation. *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 843

(6th Cir. 1994).  As the Sixth Circuit has noted, "the statutory definition of 'removal' . . . encompasses both physical removal and all RI/FS 'monitor[ing], assess[ing], and evaluat[ing]' activities."  *Id.* (citing 42 U.S.C. § 9601(23)).  As the Sixth Circuit has explained, "Congress intended that there generally will be only one removal action" at a particular site, and that it would be "simply inconsistent with [CERCLA's] 'essential purposes'" to require suit on multiple removal actions.  *Id.* (finding that emergency physical removal activities conducted by EPA from 1984 to 1986, and removal of later discovered waste in 1987, were one removal action).

As stated above, APU identifies two actions as being removal activity at the Paoli Site: (1) treatment of soils in the interim containment cell required by the Fifth Partial Preliminary Consent Decree; and (2) ongoing inspection and maintenance of the security fence and fabric filter required by the First Partial Consent Decree.  GE does not appear to dispute that these specific types of activities could constitute removal activity.  Instead, GE points out that the timing of this activity is such that it cannot be considered as part of the removal action at the Paoli Site.

The EPA issued the ROD for Paoli on July 21, 1992.  (Doc. 143-2, at 10.)  A ROD is the official documentation of the final remedial decision.  40 C.F.R. §§ 300.430(f)(4)-(5).  Some courts have found that the issuance of the ROD is significant for determining the end date of removal activity.  *See*, *e.g.*, *State of Cal. on Behalf of California Dept. of Toxic Substances Control v. Celtor Chemical Corp.*, 901 F.Supp. 1481, 1488 (N.D.Cal. 1995) (removal action began when California Health Department took soil samples, and ended when EPA signed ROD); *U.S. v. Chromatex, Inc.*, 832 F.Supp. 900, 902-903 (M.D. Pa. 1993) (finding statute of limitations for removal action did not begin to run until ROD was

completed); *U.S. v. United Nuclear Corp*., 814 F.Supp. 1552, 1561-62 (D.N.M. 1992) (statute of limitations did not begin to run until ROD was filed). However, as one court has observed and clarified, "the publication of an ROD marked the end of removal activity *under the facts of those cases*." *U.S. v. Akzo Nobel Coatings, Inc*., 990 F.Supp. 897, 907 (E.D.Mich. 1998) (emphasis in original). Accordingly, the Court finds that as a general rule, the issuance of the ROD does not create a definitive line between removal and remedial activity.

Part of the difficulty in drawing such a line, is that there is some overlap between CERLCA's definitions of "removal" and "remedial." As this Court has observed:

> Elements of remedial actions and removal actions "may overlap and semantics often obscure the actual nature of the cleanup performed." *Public Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir. 1999). In fact, "[a] response action may constitute both a removal and a remedial action, and a court is not constrained to find either term applicable at the expense of the other." *Hatco Corp. v. W.R. Grace & Co.*, 849 F.Supp. 931, 962 (D.N.J. 1994) (citing General Elec. v. Litton Indus. Automation Sys., 920 F.2d 1415, 1419–20 (8th Cir.1999)).

*Cytec*, 232 F.Supp.2d at 833; *see also New York State Elec. & Gas*, 808 F.Supp.2d at 505-506 ("Unfortunately, the overlap in the definitions of the two terms, in combination with the complexity of most CERCLA quality cleanups, can tend to blur the dividing line between the two types of responses, making it difficult to distinguish between the two and discern which is involved in a particular instance."). Courts have found that "[a]nalysis of which of the two forms of response has occurred at a particular site is generally informed by the purpose of or motivation for the action and nature of the work, and specifically whether it appears calculated to represent a long term or permanent containment or disposal program, or instead a short term cleanup arrangement intended to address an imminent

release or threat of release." *New York State Elec. & Gas*, 808 F.Supp.2d at 506 (citations omitted). Other courts have employed certain factors to determine whether an action should be characterized as "removal" or "remedial": "(1) proximity to disclosure of the final remedial design, which may occur prior to approval of the final remedial plan, (2) whether RI/FS monitoring and testing are ongoing at the time of the action, (3) whether the action falls within the statutory definition of 'removal' (or 'remedial') and (4) the action's role in the implementation of the permanent remedy." *Advanced Micro Devices, Inc. v. National Semiconductor Corp.*, 38 F.Supp.2d 802, 812 (N.D.Cal. 1999) (citing State of California v. Hyampom Lumber Co., 903 F.Supp. 1389, 1391 (E.D.Cal. 1995)). Accordingly, this Court finds that instead of examining the specific activity in isolation, it is critical to view the timing of the activity in the larger context of all the activity taking place with regards to the site. Of course, certain agency actions, such as the publication of an ROD, can provide helpful markers, but the agency action must be viewed in light of the facts of the case. *Accord Akzo Nobel Coatings*, 990 F.Supp. at 907.

In that vein, it is necessary to provide a timeline of the relevant events at the Paoli site.[12] In 1986, the EPA filed its complaint seeking to require the Rail Companies to limit access and control movement of the PCBs, conduct sampling, and clean up contamination. Between 1986 and 1990, the Rail Companies and the EPA installed fencing to limit public access to the site, paved the parking lot and high-use areas to prevent the spread of PCBs, began investigating the extent of contamination, and removed soil from nearby residential properties. In 1990, the Rail Companies installed and began operating a fuel oil recovery

---

[12]These dates are primarily derived from the Site Chronology included in the Five-Year Review Report issued by the EPA on May 5, 2006. (Doc. 143-2.)

and groundwater treatment system.  Above, this Court determined that  this date marked the start of the remedial activity for the site.  On July 21, 1992, the EPA issued a ROD for the site, which was the selection of the final remedy for the site.  As modified, the ROD required: "(1) excavation and on-site treatment of contaminated rail yard soils, (2) ground water treatment and fuel oil recovery, (3) decontamination and demolition of rail yard buildings and structures, (4) excavation of contaminated residential soils, and (5) excavation of contaminated stream sediments." *U.S. v. Penn Central Corp.*, 2004 WL 35780, *2 (E.D.Pa. Jan. 8, 2004).[13]  As APU has pointed out, the EPA entered into a series of five partial preliminary consent decrees with the Rail Companies under which they agreed to carry out this remedial work.  In 1995, the EPA proposed the sixth and final consent decree, which required the Rail Companies and APU to implement the work set forth in the ROD.  *Id.*  However, because the Rail Companies and APU were unable to cooperate, on September 30, 1996 the EPA issued a Unilateral Administrative Order ("UAO") requiring APU to implement those sections of the ROD relating to the excavation of residential soils and streams.  *Id.*  The final consent decree was entered into on April 20, 1999 (Doc. 91-8, at 60.), and was approved by the District Court for the Eastern District of Pennsylvania and affirmed by the Third Circuit.  *See United States v. Southeastern Pa. Transp. Auth.*, 235 F.3d 817 (3d Cir. 2000).

Based on the foregoing, the Court concludes that removal activity at the Paoli site was concluded as early as July 21, 1992 when the EPA issued the ROD selecting the final

---

[13]The ROD was modified on April 2, 1997 to reflect that the Paoli Yard was no longer in operations.  (Doc. 143-2, at 14.)  Accordingly, the alternative selected was changed to provide for demolition of the rail yard buildings no longer in use.  (Id.)  In addition, the worker protection stipulation was discontinued since workers were not longer in the car shop.  (Id.)

remedy for the site. However, at the very latest, removal activity was complete on April 20, 1999, which is the date of the final consent decree. Therefore, APU's claim for recovery costs, brought in 2005, are outside the three-year statute of limitations under CERCLA.

### 6.    Removal action at Sunnyside Yard

GE argues that the removal action at the Sunnyside Yard was complete by 1992. APU counters that the claims are timely because the removal actions conducted at OU-3, OU-4, and OU-5 were either completed after APU commenced this action against GE (OU-3 and OU-4) or are ongoing (OU-5).

Above, this Court held that the OUs are not subject to their own statute of limitations, and therefore there was only one statute of limitations for APU's claim for remedial costs. The Court finds that the rationale for that decision is equally applicable in the context of APU's claim for removal costs. However, the difficulty is determining the end date of removal activity at the Sunnyside site due to the complex nature of the clean up activities.

In December of 1986, the NYSDEC first listed Sunnyside as a Class 2 site in the Registry of Inactive Hazardous Waste Disposal Sites. (Doc. 91-5, at 60.) The initial RI/FS for Sunnyside was conducted by Roux Associates, Inc. on behalf of Amtrak. (Doc. 91-4, at 169.) Roux Associates completed a "Work Plan" for the RI/FS which is dated March 14, 1989. (Id.) An Interim Remedial Measure ("IRM") was designed for the site and was included in the Work Plan. (Id.)[14] The IRM was designed to recover an accumulation of

---

[14]As one district court has explained, before May of 2010, such IRMs were governed by Technical and Administrative Guidance Memorandum ("TAGM") 4048, promulgated by the NYDEC on December 9, 1992. *New York State Elec. & Gas Corp.*, 808 F.Supp.2d at 506. TAGM 4048 provided:

separate-phase petroleum identified during a previous investigation at the Yard. (Id.) The

IRM system was implemented in phases. (Id.) IRM Phase I began in January of 1990.

(Id.) IRM Phase II began in July 1991. (Id.) On March 21, 1997, the Work Plan for IRM

Phase III was published. (Id.) The purpose of IRM Phase III was to accelerate the rate of

petroleum recovery in OU-4 and allow completion of the FS for that OU. (Id.) Also in

March of 1997, the decision was made to divide the work at Sunnyside into OUs. (See

Doc. 91, Ex. F.) Construction of IRM Phase III began in October of 1998. (Doc. 91-5, at

65.) It appears that there was a Phase IV of the IRM proposed in 2004. (Doc. 115-4, at

1.) Then on March 30, 2007, the ROD for OU-3 was published. (Doc. 91-5, at 53.) The

ROD for OU-4 was published on March 31, 2009. (Doc. 114-4, at 4.) According the

NYDEC's website, the RI for OU-5 is ongoing. *See*

http://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm?pageid=3 (last visited Mar.

23, 2012).

    As explained above, the Sixth Circuit has held that the statutory definition of removal

---

An IRM means a discrete set of activities to address both emergency and non-emergency site conditions, which can be undertaken without extensive investigation and evaluation, to prevent, mitigate, or remedy environmental damage or the consequences of environmental damage attributable to a site, including but not limited to the examples listed under types of IRMs. It addresses one portion of a remedial site and can usually be addressed independently of other site issues/problems. While IRMs may be temporary solutions to an environmental problem, they may become the final remedy in certain cases. IRMs should not prevent or significantly hinder permanent remedial measure that may be required in the Record of Decision (ROD). Regardless if temporary or permanent, they will be discussed as part of the ROD process. IRMs can and will proceed both with and without consent orders.

*Id.* at 506-507 (quoting TAGM 4048, at 2). The Court notes that in the Work Plan for OU-3, dated June 23, 1997, Roux states that IRM Phases I-III "can be integrated into the final remedy for the OU-3 Site." (Doc. 91-5, at 38.)

includes both physical removal activities and all RI/FS "monitoring, assessing, and evaluating" activities. *Kelley*, 17 F.3d at 843. Accordingly, this Court has held that "removal" included the final site inspection after cleanup was completed. *United States v. Cantrell*, 92 F.Supp. 2d 704, 716 (S.D. Ohio 2000). In *Cantrell*, the EPA's primary response activity was to construct a clay cap over the site, which was a landfill containing chemicals which had ignited and began releasing hazardous smoke and gases. *Id.* at 707.[15] The installation of the clay cap was completed in April of 1994. *Id.* at 708. The EPA officials conducted a final inspection approximately seven months later. *Id.* This Court found that the complaint, filed in October of 1997, was timely because the statute of limitations ran from the date of the inspection, not the date the clay cap was put into place. *Id.* at 716.

The Court notes that *Cantrell* is factually distinguishable in two respects. First, *Cantrell* involved an action brought by the government for recovery costs, and therefore the statute of limitations was construed liberally in favor of the government. *See Cantrell*, 92 F.Supp.2d at 716.[16] Here, APU is private party seeking to recover costs. Second, in *Cantrell*, the final "monitoring, assessing and evaluating" activity occurred only a relatively short period of time after the actual physical removal activity was completed. In this case,

_____

[15]The Governor for the State of Ohio declared a state of emergency for the county where the landfill was located. 92 F.Supp. 2d at 704.

[16]In *Cantrell*, this Court cited to two district cases to support its decision: *United States v. Chromatex, Inc.*, 832 F.Supp. 900, 902 (M.D.Penn. 1993) and *United States v. City of Aberdeen*, 929 F.Supp. 989, 991 (N.D.Miss. 1996). The Court notes that *Aberdeen* relies heavily on *Chromatex*. The Court also notes that these cases were also actions brought by the government, and the courts liberally construed the statute of limitation in favor of the government. *Chromatex*, 832 F.Supp. at 902; *Aberdeen*, 929 F.Supp. at 992.

it would seem illogical to conclude that any short-term activities "intended to address an imminent release or threat of release" are occurring at the Sunnyside site over two decades after Roux Associates completed its initial Work Plan for the RI/FS.[17]  *See New York State Elec. & Gas*, 808 F.Supp.2d at 505-506.  However, this Court is constrained by the Sixth Circuit's decision in *Kelly*, which holds that the statute of limitations is not triggered until all RI/FS activity on a site is completed.  The record before this Court shows that such activity is still occurring at Sunnyside.  Therefore, the Court must find that APU's claims for removal costs for the Sunnyside site are not barred by the three-year statute of limitations under CERCLA.

### 7. Removal action at Wilmington Yard

GE argues that the removal action at Wilmington was complete by 1989.  GE derives its date from a February 23, 1989 Preliminary Assessment report issued by the EPA, which states that there is "[n]o immediate hazard from any PCB-contaminated soils to the environment and/or population exists."  (Doc. 91-9, at 80.)  APU counters that its claims are not untimely because the work identified by GE as being completed was conducted in the North Yard, which is not the subject of APU's claims against GE.  APU argues that the RI for Wilmington is ongoing, as demonstrated by the July 2007 "Draft Phase II Remedial investigation and Focused Feasibility Study Report."  (Doc. 117.)[18]  GE

---

[17] It would appear that none of the activities taking place on the site are akin to the examples set forth in the statutory definition of "removal," which include: security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act

[18] The Phase II RI/FFS followed the Draft (Phase I) Report, which was submitted to the Delaware Department of Natural Resources and Environmental Control on May 28, 1999.

does not address this distinction, but the Court notes that the 1989 report relied upon by GE is for EPA number DE-170, and the report relied upon by APU is for EPA number DE-266. Because the record before this Court shows that the RI/FS activity for the Wilmington site is not completed, this Court must find that APU's claims for removal costs for the Wilmington site are not barred by the three-year statute of limitations under CERCLA.

## B. Contribution under CERCLA

In Count III, APU brings a contribution claim pursuant to 42 U.S.C. § 9613 for the Paoli and South Amboy sites. In Count XXIII, APU brings a contribution claim for the Paoli site via assignment from the Rail Companies.

CERCLA permits a potentially responsible party ("PRP")[19] to bring contribution claims under two different provisions: (1) "during or following any civil action under section 9606 of this title or under section 9607(a) of this title;" and (2) when a party has "resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement." 42 U.S.C. § 9613(f)(1) & (f)(3)(B).

GE argues that APU's contribution claims are barred because the triggering events under the statute of limitations occurred before June 24, 2002.

The statute of limitations applicable to contribution clams is found at 42 U.S.C. §

_____

(Doc. 117-7, at 100.)

[19]"Potentially responsible parties" include: (1) the owner and operator of a facility where hazardous substances are located; (2) the owner or operator of a facility at the time when such hazardous substances were disposed of; (3) those who arranged for disposal, treatment, or transport of such hazardous substances by some other party; and (4) those who accepted hazardous substances for transport to disposal or treatment facilities from which there is a release or a threatened release. 42 U.S.C. § 9607(a)(1)-(4).

9613(g)(3), and provides:

> No action for contribution for any response costs or damages may be commenced more than 3 years after--
>
> (A) the date of judgment in any action under this chapter for recovery of such costs or damages, or
>
> (B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

The parties agree that section 9613(g)(3) is the applicable statute of limitations in this case. However, the parties disagree as to which events triggered the statute of limitations for APU's contribution claims for the Paoli and South Amboy sites.

### 1.    Contribution claim - Paoli

APU brings a contribution claim for the Paoli site based on two underlying actions brought by the United States pursuant to 42 U.S.C. § 9607. (Doc. 123, at 42, 52.) The first action is the United States' CERCLA claim against the Rail Companies. APU brings its contribution claim based on this first action by virtue of assignment. The second action is the United States' separate CERCLA claim against APU. Both of these actions were resolved by consent decrees.

GE first argues that APU's contribution claims are barred because APU's assignors, the Rail Companies, entered into its agreements with the government prior to June 24, 2002. APU counters that the five Partial Preliminary Consent Decrees were not "judicially approved settlements" under CERCLA because the Rail Companies did not resolve any of the EPA's claims against them. GE replies that if this is so, then APU has no valid claim for contribution under section 9613 because the Rail Companies did not admit liability as

required by section 9613(f)(3)(B).  APU appears to concede as much in a footnote in its brief.  (Doc. 106, at n.9 (citing BASF Catalysts, LLC v. U.S., 479 F. Supp.2d 214, 218 (D. Mass. 2007) and explaining that an agreement that does not resolve any liability cannot support a contribution claim under § 113(f)(3)(B))).  However, APU does not address the effect of the sixth and final consent decree, which was entered into on June 27, 1997 and approved by the Eastern District of Pennsylvania on April 6, 1999.  *See U.S. v National Railroad Passenger Corp.*, 1999 WL 199659 (E.D. Pa. April 6, 1999), aff'd 235 F.3d 817 (3d Cir. 2000).

The Court finds that any contribution claim that APU might have by virtue of assignment is time-barred by final consent decree which was entered into on June 27, 1997 and judicially approved by the Eastern District of Pennsylvania on April 6, 1999.  The Rail Companies assigned to APU "any and all claims relating to the Paoli Rail Yard Site, if any, against General Electric Company . . . or any component manufacturer of rail cars that may have contributed to contamination at the Paoli Rail Yard Site."  (Doc. 92, Ex. 14, at 5.)  This language demonstrates that APU "stands in the shoes" of the Rail Companies. *See Moraine Properties, LLC v. Ethyl Corp.*, 2008 WL 4758692, *4 (S.D.Ohio Oct. 27, 2008) ("Common sense dictates that § 107(a) is the appropriate vehicle for a party that, as an assignee, 'stands in the shoes' of the true plaintiff in a § 107(a) claim.").  Because the Rail Companies themselves would be time-barred from bringing a contribution claim against GE, APU is also barred.

APU's contribution claim based on the second action brought by the United States against APU is by far less straightforward.  APU points out that it settled these claims with EPA as part of a 2005 Consent Decree.  (Doc. 143-5, at 2.)  APU argues that the 2005

Consent Decree is the trigger for the statute of limitations on its contribution claim.

GE responds that the 2005 date cannot serve as the trigger for the statute of limitations because APU was already subject to a "judgment" when the EPA issued its UAO on September 30, 1996 requiring APU to implement certain sections of the ROD.[20] APU argues that the UAO was not a "civil action" under Section 9613(f)(1).[21] The parties' divergent positions on this issue is understandable given the current state of the law.

The EPA is authorized under section 9606(a) to issue UAOs "as may be necessary to protect public health and welfare and the environment." 42 U.S.C. § 9606(a). The Supreme Court has expressly declined to address the issue of whether a UAO is a "civil action" under Section 9613(f)(1). *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 168 n. 5 (2004) ("Neither has Aviall been subject to an administrative order under § 106; thus, we need not decide whether such an order would qualify as a 'civil action under

---

[20]GE points out that on September 28, 1999 APU brought a previous section 9613 claim against the Rail Companies based on the same UAO in the Eastern District of Pennsylvania. (Doc. 91-9, at 223.) That claim was dismissed with prejudice by the Pennsylvania district court. *U.S. v. Penn Central Corp.*, 2004 WL 35780, *8 (E.D.Pa. Jan. 8, 2004). The court determined that the Rail Companies were entitled to contribution protection under section 9613(f)(2) by virtue of the 1997 Final Consent Decree. *Id.* at *6-7.

[21]This section provides in full:

(1) Contribution

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613 (f)(1).

section 9606 . . . or under section 9607' of CERCLA."). However, the Sixth Circuit has noted in *dicta* that a section 9606(a) order is a "quintessential" action for contribution. *Centerior Service Co. v. Acme Scrap Iron & Metal Corp*., 153 F.3d 344, 351 (6th Cir. 1998), overruled on other grounds, *United States v. Atlantic Research Corp*., 551 U.S. 128 (2007). District courts which have addressed the issue directly have come to opposite conclusions. *See Carrier Corp. v. Piper*, 460 F.Supp.2d 827, 840 (W.D. Tenn. 2006) (finding that a UAO is a "civil action"); *Raytheon Aircraft Co. v. United States*, 435 F.Supp.2d 1136, 1142-43 (D.Kan. 2006) (finding that UAO is not a "civil action"); *Pharmacia Corp. v. Clayton Chem. Acquisition LLC*, 382 F.Supp.2d 1079, 1086-87 (S.D.Ill. 2005) (finding that UAO is not a "civil action"); *Blue Tee Corp. v. ASARCO, Inc*., 2005 WL 1532955, **3-4 (W.D.Mo. June 27, 2005) (finding that UAO is not a "civil action").

This Court finds that the analysis of this issue in these cases is only partially applicable. Here, APU was in fact subject to a civil action pursuant to section 9607 at the time the UAO was issued.[22] The United States brought a section 9607(a) claim against APU in 1992. The complaint is specifically mentioned in the 1996 UAO. (Doc. 91-9, at 157.) Therefore, the UAO was issued "during" a civil action under section 9607(a).[23] *See* 42 U.S.C. 9613(f)(1). The question then becomes whether a UAO issued while a civil action under section 9607(a) is pending can serve as a "judgment" under section 9613(g)(3)(A).

---

[22]Based on the recounting of the facts in the district court cases cited, there was no similar civil action pending in those cases.

[23]The Court is aware that indirectly it is concluding that the issuance of a UAO itself is not a "civil action" as that term is used in section 9613(f)(1).

The Court concludes that the "judgment" referenced in section 9613(g)(3)(A) does not include the issuance of a UAO. To reach this conclusion, the Court relies primarily on the enforcement scheme enacted by Congress:

> Once EPA issues a UAO, the recipient PRP has two choices. It may comply and, after completing the cleanup, seek reimbursement from EPA. 42 U.S.C. § 9606(b)(2)(A). If EPA refuses reimbursement, the PRP may sue the agency in federal district court to recover its costs on the grounds that (1) it was not liable for the cleanup, *id.* § 9606(b)(2)(B)(C); or (2) it was liable but EPA's selected response action (or some portion thereof) was "arbitrary and capricious or . . . otherwise not in accordance with law," *id.* § 9606(b)(2)(D). Alternatively, the PRP may refuse to comply with the UAO, in which case EPA may either bring an action in federal district court to enforce the UAO against the noncomplying PRP, *id.* § 9606(b)(1), or clean the site itself and then sue the PRP to recover its costs, *id.* § 9607(c)(3).

*General Elec. Co. v. Jackson*, 610 F.3d 110, 115 (D.C. Cir. 2010). This framework demonstrates that while contribution claims based on sections 9606 and 9607(a) are similar, they are separate. A UAO may eventually become the basis for a "judgment," but that judgment must be "during or following any civil action under section 9606" and not merely because an action under section 9607(a) happens to be pending. Therefore, the Court concludes that the 1996 UAO did not trigger the statute of limitations for APU's contribution claim.[24]

The Court now turns to the effect of the 2005 Consent Decree between the EPA and APU. GE argues that the 2005 Consent Decree is not a "judicially approved settlement"

---

[24]Regardless of this finding, the Court notes that the 1996 UAO only required APU to implement the portions of the ROD related to "Non-Rail Yard Site Property" (Doc. 91-9, at 168.) Therefore, because the scope of the 1996 UAO was limited, only part of APU's contribution claim would be time-barred by the UAO. APU would still have a right to contribution on the remainder of the costs. *See Raytheon Aircraft Co.*, 435 F.Supp.2d at 1144 (D.Kan. 2006) (concluding that "the right to contribution under section 113(f)(3)(B) is defined by the scope of the liability resolved.").

under section 9613(f)(3)(B) because it did not resolve APU's liability.  GE points out that APU did not admit liability in the settlement agreement and the government retains the right to proceed against APU.  This argument, in effect, goes to the merits of APU's contribution claim, and accordingly, the parties have briefed the same issue as part of GE's Motion for Summary Judgment on the Merits.  (Docs. 92, 123, 142.)

Both parties rely on the Sixth Circuit's decision in *ITT Industries, Inc. v. BorgWarner, Inc.*, 506 F.3d 452 (6th Cir. 2007).  APU argues that a party may seek contribution for a judicially approved settlement that only resolves some of its liability, and therefore it is not necessary to show that 2005 Consent Decree was a final resolution of all of its liability. The Sixth Circuit's decision in *ITT Industries* supports this position.  The court pointed out that section 9613(f)(3)(B) provides that: "[a] person who has resolved its liability to the United States . . . for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement."  506 F.3d at 459 (quoting 42 U.S.C. § 9613(f)(3)(B)).  Accordingly, the court explained: "as an initial matter, § [9613](f)(3)(B) requires that parties resolve 'some or all' of their liability as to the United States."  *Id.*  Therefore, the court concluded that section 9613(f)(3)(B) allows for contribution based on agreements which partially resolve CERCLA liability.  *Id.*  However, the court found that the Administrative Order by Consent ("AOC") the plaintiff voluntarily entered with the EPA failed to resolve *any* of the plaintiff's liability, and therefore the AOC could not support a contribution claim.  *Id.* at 459-460.  GE argues that the 2005 Consent Decree suffers from the same fatal flaw.

A comparison of what was reserved by the EPA in the AOC in *ITT Industries* and

the 2005 Consent Decree demonstrates that APU did resolve at least *some* of its liability.

In *ITT Industries*, the Sixth Circuit found that there were two critical portions of the AOC which demonstrated that the plaintiff had not resolved any of its liability. First, the plaintiff expressly stated that it was not conceding liability. *Id.* at 460. Similarly, the 2005 Consent Decree specifically states that APU "does not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the Complaint." (Doc. 143-5, at 3.)

Second, the Sixth Circuit noted that "the EPA expressly reserve[d] its rights to legal action to adjudicate Plaintiff's liability for failure to comply with the AOC, for costs of response (past, present, or future), for costs of injunctive relief or enforcement, criminal liability, and other damages." *ITT Indus.*, 506 F.3d at 459. Similarly, in the 2005 Consent Decree, the United States reserved the right to adjudicate APU's: (a) "liability for failure . . . to meet a requirement of this Consent Decree;" (b) "liability for coss incurred or to be incurred by the United States that are not within the definition of Past Response Costs, Future Response Costs, or Natural Resource Damages;" (c) "liability for injunctive relief or administrative order enforcement under Section 106 of CERCLA;" (d) "criminal liability;" and (e) liability for certain Natural Resource Damages. (Doc. 143-5, at 11.)

However, the 2005 Consent Decree is missing a provision which the Sixth Circuit found important in *ITT Industries*. That is, the Sixth Circuit noted that the AOC provided that "should the EPA disapprove of Plaintiff's SRI/FFS Work Plan, 'U.S. EPA retains all of its rights under this Consent Order and CERCLA, including, but not limited to, the right to terminate this Consent Order, complete all SRI/FFS activities, and obtain reimbursement . . . .'" *Id.* at 459-460. In contrast, the 2005 Consent Decree includes a covenant not to

sue, which provides that "the United States covenants not to sue or to take administrative action against [APU] pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to recover Past Response Costs, Future Response Costs, or Natural Resource Damages." (Id.)  In other words, unlike the AOC in *ITT Industries*, the 2005 Consent Decree does not give the United States the right terminate the agreement and pursue its Section 9607(a) rights under CERCLA if APU does not satisfactorily perform its obligations under the Consent Decree.  While the United States reserved the right to pursue APU for "liability for failure of [APU] to meet a requirement of this Consent Decree" and even the right to issue administrative orders under Section 9606, the Consent Decree makes it clear that any claims to recover costs under Section 9607 would be not be pursued.  As a result, the Court concludes that the 2005 Consent Decree resolves "some" of APU's liability to the United States, and therefore the 2005 Consent Decree is a "judicially approved settlement"within the meaning of Section 9613(f)(3)(B).  Accordingly, the 2005 Consent Decree can form the basis for a contribution claim under Section 9613(f)(3)(B).

Finally, there has been some discussion by the parties regarding a contribution claim based upon the third-party claims brought by the Rail Companies against APU.  The Rail Companies resolved these claims against APU pursuant to a Settlement Agreement entered into by APU and the Rail Companies on November 8, 2004.  (Doc. 92-4.)  GE explains that the only claims remaining at that time, and therefore the only claims settled, were contribution claims under Section 9613(f).  GE explains that the Pennsylvania court had previously dismissed the Section 9607(a) cost recovery claims against APU. GE argues that any claim based on this settlement would be "contribution for contribution" and such a claim fails on merits.  (Doc. 92-1, at 58.)

APU responds that this case is procedurally inapposite to a situation involving a "contribution for contribution" claim. APU also argues that the 2004 Settlement Agreement assigned the Rail Companies' claims to APU, and therefore APU is entitled to pursue any contribution claim the Rail Companies have against GE. (See Doc. 94-2, at 52) ("SEPTA, Conrail, and Amtrak . . . voluntarily agree to assign to APU any and all claims relating to the Paoli Rail Yard Site, if any, against General Electric Company . . .")

To begin, the 2004 Settlement Agreement was between private parties, and therefore did not "resolve its liability to the United States or a State" as required by Section 9613(f)(3)(B). Moreover, there is no evidence the that settlement was ever "judicially approved" as required by section 9613(f)(3)(B) or section 9613(g)(3)(B).

As this Court has recently explained, a contribution claim can not exist if it is not tied to one of the triggering events in 9613(g)(3) because "Congress would not have drafted Section 113 without specifying a limitations period for all possible types of allowable contribution actions." *Hobart Corp. v. Waste Management of Ohio, Inc*., 2011 WL 6936191, *18 (S.D.Ohio Feb. 10, 2011). This Court found support in the following paragraph from the Supreme Court's decision in *Cooper Indus., Inc. v. Aviall Servs., Inc.*:

> As noted above, § 113 provides two express avenues for contribution: § 113(f)(1) ("during or following" specified civil actions) and § 113(f)(3)(B) (after an administrative or judicially approved settlement that resolves liability to the United States or a State). *Section 113(a)(3) then provides two corresponding 3–year limitations periods for contribution actions, one beginning at the date of judgment, § 113(g)(3)(A) and one beginning at the date of settlement, § 113(g)(3)(B).* Notably absent from § 113(g)(3) is any provision for starting the limitations period if a judgment or settlement never occurs, as is the case with a purely voluntary cleanup. The lack of such a provision supports the conclusion that, to assert a contribution claim under § 113(f), a party must satisfy the conditions of either § 113(f)(1) or § 113(f)(3)(B).

*Id.* (quoting Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 167 (2004)) (emphasis in the original).[25]   Therefore, the Court rejects the notion that a contribution claim can exist outside the limitations found in 9613(g)(3).   Therefore, the 2004 Settlement Agreement cannot form the basis of a contribution claim under this section.   This conclusion would be the same regardless of whether APU was bringing the claim directly, or through assignment from the Rail Companies.[26]

Next, the Court will examine whether APU can pursue its contribution claim under Section 9613(f)(1) by virtue of the fact that it was made "during or following" a civil action under Section 9607.   In support of this argument, APU cites to a statement made by the Supreme Court in *Atlantic Research* that "Section 113(f)(1) authorizes a contribution action to PRPs with common liability *stemming* from an action instituted under § 106 or § 107(a)." 551 U.S. at 139 (emphasis added).   APU argues the Supreme Court's use of the word "stemming" means that APU may bring a subsequent contribution claim against GE,

---

[25]The Sixth Circuit has also indicated that a contribution claim is defined by section 9613(g)(3):

> RSR acknowledges that the 1999 consent decree constitutes a "judicially approved settlement" "resolv[ing] [RSR's] liability to the United States" for the purpose of authorizing a contribution action.  *See id.* § 9613(f)(3)(B).  And we see no reason why it does not also constitute a "judicially approved settlement" for the purpose of limiting when that action may be brought-for determining in other words when the right to bring that action accrues for statute-of-limitation purposes.  To conclude otherwise would allow a "judicially approved settlement" to authorize a contribution action to recover the "costs" imposed by that settlement without placing any limit on when that action must be brought.

*RSR Corp. v. Commercial Metals Co.*, 496 F.3d 552, 556 (6th Cir. 2007).

[26]As GE points out, the Rail Companies were the recipients of APU's settlement payment.  It would be illogical for the Rail Companies to seek contribution following settlement with APU.

another potential PRP who was not a part of the original action. APU's argument might carry some weight if the 2004 Settlement Agreement actually did "stem" from an action under Section 9607. The record before the Court demonstrates that APU paid $38 million to settle the contribution claims the Rail Companies brought against APU.

APU also argues that there is nothing in CERCLA which requires a PRP to bring a contribution claim in the original section 9607 action. This is true, and in fact, APU has brought a subsequent contribution claim in this very case premised on its claim that it overpaid its share of costs as a result of the section 9607 claims brought against it by the EPA and the Rail Companies. However, the contribution claim APU seeks to bring as a result of the 2004 Settlement Agreement is not based on an alleged overpayment of recovery costs or reimbursed costs. Instead, this contribution claim is based on contribution costs which APU agreed to pay to resolve the contribution claims the Rail Companies brought against it. The Court concludes that this is contrary to the meaning of contribution as it is used in section 9613. As the Supreme Court has explained:

> Section 113(f) explicitly grants PRPs a right to contribution. Contribution is defined as the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." Black's Law Dictionary 353 (8th ed. 2004). Nothing in § 113(f) suggests that Congress used the term "contribution" in anything other than this traditional sense. The statute authorizes a PRP to seek contribution "during or following" a suit under § 106 or § 107(a). 42 U.S.C. § 9613(f)(1). Thus, § 113(f)(1) permits suit before or after the establishment of common liability. In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties.

*Atlantic Reseach*, 551 U.S. at 138-39. GE may indeed share common liability with the Rail Companies and APU, and there is no dispute that a right of contribution could stem from this liability. However, the 1994 Settlement Agreement can not be the source of any

contribution claim, and GE is entitled to summary judgment APU's claim to the extent that it is based on the 1994 Settlement Agreement.

## 2.     Contribution claim - South Amboy

GE argues that APU has not offered any proof that it entered into a judicially approved settlement at South Amboy, and therefore APU cannot maintain a contribution claim pursuant to Section 9613(f). This argument again reaches the merits of APU's claim, and the parties arguments are duplicated in the parties' briefing of GE's Motion for Summary Judgment on the Merits. (See Doc. 92-1, at 61; Doc. 123, at 58; Doc. 142, at 27.)

APU claims that it has a valid Section 9613(f) claim because it made a "judicially approved" settlement payment to the New Jersey Transit Corporation. However, as GE points out, the order dismissing the claims against APU only states that "the terms of the settlement are incorporated herein by reference." (Doc. 142-1.) Moreover, it does not appear from the docket that the parties' settlement agreement was filed or provided to the court. (Doc. 45.) GE argues that even if the New Jersey court had been furnished with a copy of the settlement agreement, simply "incorporating by reference" settlement terms into a dismissal order does not make for a "judicially approved settlement" within the meaning of Section 9613(g)(3)(B). GE cites to a recent decision of this Court where the Court determined that judicial approval of a CERCLA settlement agreement requires a court to "determine whether [the agreement] is 'fair, reasonable and adequate[,] in other words consistent with the purposes that CERCLA is intended to serve.'" *Responsible Env. Solutions Alliance v. Waste Mgmt., Inc.*, 2011 WL 382617 at *2 (S.D. Ohio Feb. 3, 2011) (quoting United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1435 (6th Cir. 1989)).

This Court does not dispute that GE has identified the proper standard when there is a challenge to a settlement agreement or consent decree. *See e.g.*, *Akzo Coatings*, 949 F.2d at 1416 ("The state challenges the legality of the remedial action, and seeks to prevent entry of the consent decree."). However, there is nothing in CERCLA or the caselaw interpreting CERCLA which indicates what level of "approval" is necessary to turn the settlement agreement into the basis for a valid contribution claim.

Nevertheless, the Court finds it unnecessary to reach a conclusion on that issue because as a practical matter, this Court is unable to conclude based on the record before it that APU has resolved its liability to the State of New Jersey "for some or all of a response action or for some or all of the costs of such action." 42 U.S.C. § 9613(f)(3)(B); *see also ITT Industries,* 506 F.3d at 459 ("§ 113(f)(3)(B) requires that parties resolve 'some or all' of their liability as to the United States."). The Court has only been presented with a letter setting forth the payment terms of the settlement agreement. (Doc. 97-1, at 61.) Based on this letter alone, the Court is unable to determine under whether the agreement can form the basis of a contribution claim under 42 U.S.C. § 9613(f)(3)(B). Therefore, APU cannot move forward on that claim in this matter, and GE is entitled to summary judgment on this claim.

### C.    PAHSCA claims - Paoli

GE argues that APU's claims pursuant to the Pennsylvania Hazardous Sites Cleanup Act ("PHSCA") are barred by the applicable statute of limitations.[27]  The parties

---

[27]GE also argues that to the extent that any state law statute of limitations is in conflict with CERCLA, that state law is preempted. However, GE recognizes that this Court rejected that contention in its August 1, 2008 Order.

appear to agree that the applicable statute of limitations is found at 35 Pa. Stat. Ann. §6020.1114:

> . . . actions for civil or criminal penalties under this act or civil actions for releases of hazardous substances may be commenced at any time within a period of 20 years from the date the unlawful conduct or release is discovered. Actions to recover response costs may be commenced within six years of the date those costs are incurred. The initial action to recover response costs shall be controlling as to liability in all subsequent actions.

APU argues that its claims under the PAHSCA are not barred because it brings a cost-recovery claim and a contribution claim, which are subject to the six-year statute of limitations. APU explains that the statute of limitations begins to run on the date that the response costs are incurred. As a factual matter, APU does not dispute that the recovery costs at the Paoli site date back to 1986. Instead, APU argues that the limitations period began to run in either 2004 or 2005 when it settled its liability with the Rail Companies and the EPA. Alternatively, APU argues that the statute of limitations has not yet begun to run because APU continues to incur costs at the Paoli site.

The Third Circuit has instructed that "the cost recovery and contribution provisions in [P]HSCA are virtually identical to those in CERCLA." *Agere Systems, Inc. v. Advanced Environmental Technology Corp*., 602 F.3d 204, 236 (3d Cir. 2010) (comparing 35 Pa. Stat. Ann. §§ 6020.702(a)(3), 705(a), with 42 U.S.C. §§ 9607(a)(4)(B), 9613(f)). Therefore, the Third Circuit explained that issues related to CERCLA and PHSCA claims should be addressed identically. *Id.* Above, the Court dismissed all of APU's recovery claims under CERCLA as being time-barred. The Court also dismissed certain portions of APU's contribution claim under CERCLA as being time-barred. Based on the direction provided by the Third Circuit, the Court finds that APU's claims under the PHSCA are time-barred

for the same reasons the Court has held that APU's CERCLA claims are time- barred. Accordingly, GE is entitled to summary judgment on those claims. However, APU's contribution claim remains to the extent that it is based on the 2005 Consent Decree.[28]

### D.    New Jersey Spill Act - South Amboy

GE argues that New Jersey Spill Act claims are barred by a six-year limitation period that began running in 1997 when APU became aware that the property South Amboy was contaminated.[29]    GE explains that while the Act itself does not contain a statute of limitations, New Jersey courts apply the statute of limitations applicable to environmental tort actions, N.J. Stat. Ann. 2A:14-1.   *See Reichhold v. U.S. Metals Refining Co.*, 655 F.Supp. 2d 400, 446-47 (D.N.J. 2009) (noting that "[t]he Spill Act does not contain a statute of limitations for private contribution actions" and applied N.J. Stat. Ann. 2A:14-1).  APU agrees that this six-year statute of limitations applies, and also agrees that the statute is triggered when the claim accrues.  However, APU argues that its cause of action did not accrue until 2004 when New Jersey Transit Corporation filed an action against APU, or alternatively in 2008, when APU settled New Jersey Transit's claims against it.

The Court finds neither of these dates triggered the statute of limitations because APU's Spill Act claim has yet to accrue.  As this Court explained above, APU has not claimed any direct recovery costs at the Paoli site.  APU's claims are solely based on

---

[28]GE argues that Ohio's borrowing statute, Ohio Revised Code § 2305.03(B) applies to APU's state law claims.  The Court finds it unnecessary to apply the six-year statute of limitations under the borrowing statute to APU's PHSCA claim because the PHSCA also provides for a six-year statute of limitations.

[29]GE explains that APU was served with a treble damage demand by the New Jersey Department of Environmental Protection in 1997.

reimbursement of costs paid by others. Under the Spill Act, only those "dischargers or persons" who "cleans up and removes a discharge of a hazardous substance" may bring a claim for contribution. *See* N.J. Stat. Ann. 58:10–23.11f(a)(2) ("Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.") Therefore, a cause of action under section 23.11f(a)(2) can accrue only when a plaintiff has engaged in cleanup and removal of a discharge of a hazardous substance. *Hatco Corp. v. W.R. Grace & Co.-Conn*., 836 F.Supp. 1049, 1093 (D.N.J.1993) ( "To qualify as a contribution plaintiff [under the Spill Act], [plaintiff] must demonstrate that it has cleaned up and removed a discharge of a hazardous substance."); *Bowen Engineering v. Estate of Reeve*, 799 F.Supp. 467, 480 (D.N.J. 1992) (Spill Act contribution claim premature where NJDEP had not yet commenced removal of hazardous substance and has only conducted investigation).

Therefore, the Court finds that GE is entitled to summary judgment on APU's Spill Act claim.

### E.    DHSCA - Wilmington

GE argues that APU's claim under the Delaware Hazardous Substances Cleanup Act is subject to a three-year limitation period under 7 Del. Code §8106 that runs from the time a wrongful act is committed. GE argues that at the latest, APU's DHSCA claim accrued when APU entered a Voluntary Cleanup Agreement with the State of Delaware

in 1998.  APU responds by claiming that its cause of action has not yet accrued because there is no settlement or final agreement to allocate costs at the Wilmington site.  APU explains that it is seeking declaratory judgment that GE is required under the DHSCA to reimburse APU for the costs it will incur as a result of the clean up at Wilmington.

The Court concludes based on the record before it that APU's claims have yet to accrue and therefore they must be dismissed.  *Accord BP Amoco Chemical Co. v. Sun Oil Co.*, 166 F.Supp.2d 984, 999 (D.Del. 2001) (dismissing declaratory judgment claims seeking CERCLA and HSCA contribution where plaintiff had not yet been found to be a responsible party for contamination sites and therefore had not yet paid response costs).  Therefore, the Court finds that GE is entitled to summary judgment on any claim raised by APU pursuant to the Delaware Hazardous Substances Cleanup Act.

### F.     Common law torts

GE argues that APU's tort claims based on the common law of New York, Delaware, and New Jersey claims are time barred.[30]  APU responds that its state common law claims remain viable under a "continuing tort doctrine."  This Court previously rejected this theory under Pennsylvania law and dismissed APU's common law tort claims under Pennsylvania law as being time-barred.  (Doc. 60.)[31]  For the reasons stated below, the Court finds that the continuing tort doctrine does not apply to all of APU's remaining common law tort

---

[30]GE explains that APU admitted in interrogatories that it became aware it could be held liable for PCB contamination at each site as follows: (1) Paoli in 1986; (2) Sunnyside on October 21, 1997; (3) Wilmington on August 17, 1995; and, (4) South Amboy on June 25, 1997.  APU does not challenge this recitation of the facts.

[31]APU challenges this conclusion in a footnote in its brief.  (Doc. 106, at n.15.)  There is nothing contained in those arguments which would lead the Court to reconsider its ruling regarding the timeliness of those claims.

claims.

## 1.    New York

The New York legislature has enacted a discovery rule for environmental contamination cases which provides:

> Notwithstanding the provisions of section 214, the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

N.Y. C.P.L.R. § 214–c(2).  In *Jensen v. General Electric Co.*, 623 N.E.2d 547 (N.Y. 1993), the court found that the legislature enacted this provision to eliminate continuing tort theories in environmental contamination cases.  *Id.* at 552 ("the reasonable interpretation of the present statute, from the Legislature's words and actions, is that it intended no continuing-wrong exception to its new comprehensive, across-the-board rules"); *see also Syms v. Olin Corp.*, 408 F. 3d 95, 110 (2d Cir. 2005) ("there is no longer any basis in New York law for applying the continuing tort doctrine").

Accordingly, the Court finds that because APU's New York common law tort claims were not filed within three years of the date of discovery, those claims are time-barred and GE is entitled to summary judgment on those claims.

## 2.    Delaware

GE argues that APU's claims under Delaware law are barred by the applicable statute of limitations found at 10 Del. C. § 8106, which provides that no action arising in tort "shall be brought after the expiration of 3 years from the accruing of the cause of such

action."[32]  Under Delaware law, a tort claim generally accrues when the wrongful act occurs. *Ontario Hydro v. Zallea Systems, Inc.*, 569 F.Supp. 1261, 1268 (D. Del. 1983) ("The general and well-settled law of Delaware is that tort actions accrue under 10 Del.C. § 8106 at the time of the occurrence of the wrongful act, and that the statute of limitations begins to run from that date, and ignorance of the cause of action, absent affirmative concealment or fraud, is no obstacle to the operation of the limitation period.").

APU does not dispute that the applicable statute of limitations is three years, but instead argues that Delaware courts recognize the continuing tort doctrine.  As to the trespass claim, at least one Delaware court has recognized a theory of continuing trespass. *See Gordon v. National Railroad Passenger Corp.*, 1997 WL 298320, *9 (Del.Ch. Mar. 19, 1997) (finding that deposit of contaminated soil on "land in the possession of another" could constitute a continuing trespass as defined by section 161 of the Restatement). [33]

---

[32]The full text of the relevant portion of the statute provides:

(a) No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action; subject, however, to the provisions of §§ 8108–8110, 8119 and 8127 of this title.

Del.Code Ann. tit. 10, § 8106.

[33]The Court notes that the facts of this case involved environmental contamination emanating from the same railyard in Wilmington as in this case.  The defendants in *Gordon* argued that the court should find that the claim was one addressed by comment e of the Restatement of Torts § 162.  1997 WL 298320, *9.  This comment distinguishes continuing trespasses from trespasses which permanently change the land.  The court in *Gordon* did not discuss this distinction, and went on to find that the trespass was a continuing trespass because contaminated fill was deposited on the plaintiff's property in violation of a license

Delaware courts would also appear to recognize the theory of continuing tort in a negligence claim. *Oakes v. Gilday*, 351 A.2d 85, 87 (Del.Super. 1976) (citing 54 C.J.S. Limitations of Actions § 169, p. 128) (recognizing that "[t]he general rule in tort law is that in the case of a continuing tort and injury whose damages cannot be determined until the cessation of the wrong, the statute of limitations begins to run no earlier than the last date of the wrong.").

GE argues that regardless of the application of the continuing tort doctrine under Delaware law, APU's common law tort claims are time-barred because APU was required to demand that GE remove any alleged contaminants within the three year period set forth in the relevant statute of limitations. However, GE provides no citation for this requirement, and the Court's own research has not uncovered a source for this requirement under Delaware law. Therefore, the Court concludes that APU's tort claims under Delaware law are not barred by the statute of limitations and GE is not entitled to summary judgment on these claims.[34]

### 3. New Jersey

GE explains that the applicable statute of limitations under New Jersey is found at N.J.S.A. § 2A:14–1:

---

allowing the deposit of clean fill. The Court notes that this decision conflicts with the Court's conclusion regarding Pennsylvania law interpreting the same provisions of the Restatement.

[34]GE has argued that Ohio's borrowing statute, Ohio Revised Code § 2305.03(B), requires this Court to apply the shorter limitation period of Ohio or foreign law if a claim arising in another state is brought in Ohio. GE argues that Ohio's statute of repose eliminates any claim based upon improper design or manufacture of a product within ten years after the product is delivered. *See* Ohio Rev. Code § 2305.10(C). However, this Court has previously held that Ohio Revised Code § 2305.10 does not preclude common-law actions. *Wells v. Thomson Newspaper Holdings, Inc.*, 183 F.R.D. 225, 228 (S.D.Ohio 1998).

Every action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, for replevin of goods or chattels, for any tortious injury to the rights of another not stated in sections 2A:14–2 and 2A:14–3 of this Title, or for recovery upon a contractual claim or liability, express or implied, not under seal, . . . shall be commenced within 6 years next after the cause of any such action shall have accrued.

APU does not dispute that this six-year statute of limitations is applicable, but instead argues that New Jersey courts recognize the continuing tort doctrine. *Accord Russo Farms, Inc. v. Vineland Board of Education*, 675 A.2d 1077 (N.J. 1996) (setting forth principles governing continuing tort doctrine under New Jersey law).

In *Russo Farms*, the Supreme Court of New Jersey explained the continuing tort doctrine in the context of a nuisance claim:

When a court finds that a continuing nuisance has been committed, it implicitly holds that the defendant is committing a new tort, including a new breach of duty, each day, triggering a new statute of limitations. That new tort is an "alleged present failure" to remove the nuisance, and "[s]ince this failure occurs each day that [defendant] does not act, the [defendant's] alleged tortious inaction constitutes a continuous nuisance for which a cause of action accrues anew each day." Essentially, courts in those cases impose a duty on the defendant to remove the nuisance. Because the defendant has a duty to remove the nuisance, and because the defendant's failure to remove the nuisance is a breach of that duty, each injury is a new tort. The plaintiff is therefore able to collect damages for each injury suffered within the limitations period.

*Id.* at 1084 (citations omitted) (alteration in original). The court explained that in contrast, a nuisance is permanent and does not constitute a continuing nuisance when "there is only one unceasing invasion of the plaintiff's interests." *Id.* at 1085 (quoting Dan B. Dobbs, Law of Remedies, § 5.4, at 343 (1973)). The court concluded that in the case before it, the intermittent floods over a period of ten years was a continuing nuisance. *Id.* at 1086-87.

However, the Third Circuit has concluded that under a different set of facts, the

disposal of hazardous waste does not constitute a continuing tort under *Russo Farms*, and therefore the plaintiff's nuisance, negligence, and strict liability claims were barred by the statute of limitations. *Haddonbrook Associates v. General Elec. Co.*, 427 Fed.Appx. 99, 102-103 (3d Cir. 2011). This Court sees nothing which would distinguish the Third Circuit's decision from the facts of this case. Therefore, the Court concludes that APU has not established continuing tort claims under New Jersey law.

Application of New Jersey's discovery rule requires that this Court find that APU's claims are untimely. *Vispiano v. Ashland Chem. Co.*, 527 A.2d 66, 71 (N.J. 1987) (a cause of action accrues when "the plaintiff learns, or reasonably should learn, the existence of that state of facts which may equate in law with a cause of action."). Therefore, GE is entitled to summary judgment on APU's tort claims under New Jersey law.

### G. Contractual indemnity

In Count IV, APU asserts a claim for contractual indemnity based on the sales contract between GE and SEPTA for the Silverliner IV railcars. In Count V, APU asserts a claim for contractual indemnity based on the sales contract between GE and the New Jersey Department of Transportation ("NJDOT") for the Jersey Arrow II railcars.[35] APU

---

[35]The indemnity provision in both contract is virtually identical and provides:

. . .Contractor [GE] hereby assumes all risk and responsibility and shall indemnify and save … the Railroad [Penn Central] harmless from any and all claims, suits, demands, and causes of action of any kind or nature whatsoever, and expenses incidental thereto, including, but not limited to counsel fees, for the loss of life or property or injury or damage to the person or property of any person or corporation whatsoever, (including, but without limitation of the foregoing, the person or property of the Contractor, or its Subcontractors, [SEPTA/NJDOT] and/or the Railroad and their respective officers agents, or employees), caused by the Contractor in the manufacture, testing, inspection or repair of any of the cars, or any part thereof, whether occurring prior to or after acceptance of such car by [SEPTA/NJDOT] from the Contractor and whether occurring on or off the premises of the Railroad. . . .The

claims that it is a third-party beneficiary of these contracts.[36]

There is no dispute between the parties that the contracts provide that Pennsylvania and New Jersey law apply. However, the parties do not agree as to which law under the laws of those states applies to APU's claims. GE argues that because the SEPTA and NJDOT contracts were for the sale of goods, the contractual indemnity claims are governed by the Uniform Commercial Code, which has been adopted in Pennsylvania and New Jersey. GE argues that the claims are barred under the UCC's four-year statute of limitations for a sale of goods.[37] APU disputes the applicability of the UCC, and argues that the contracts are governed by the general statute of limitations for indemnity contracts under Pennsylvania and New Jersey law. Under that law, APU argues its claims did not

---

Contractor shall further assume all liability for loss by reason of neglect or violation of federal, state or local laws, ordinances or regulations, and all work necessary to conform to said laws, ordinances, and regulations is included in this Contract.

[36]In the briefing on its Motion for Partial Summary Judgment on the issue of Defendant's Indemnification Liability, APU appears to argue that it may assert a contractual indemnity claim as the assignee of SEPTA, Amtrak and Conrail. (See Doc. 141, at 12.) The Court will not address the merits of such a claim at this time.

[37]The UCC provision is § 2-725, and provides as follows:

Statute of Limitations in Contracts for Sale

(a) General rule.--An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(b) Accrual of cause of action.--A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

See 13 Pa.C.S.A. §2725; N.J.S.A. §12A:2-725.

accrue until the final payments were made for clean up costs at the sites.[38]

The issue of the statute of limitations that governs an indemnity suit where the plaintiff's rights arise from the breach of a contract for the sale of goods "is a matter of some dispute." *Electric Ins. Co. v. Freudenberg-Nok, General Partnership*, 487 F.Supp.2d 894, 897 (W.D.Ky. 2007) (citing David J. Marchitelli, Causes of action governed by limitations period in UCC § 2-725, 49 A.L.R. 5th 1 (1997) (collecting cases)). The majority of jurisdictions to answer this question have held that UCC § 2-725 does not apply to such actions. *Id.* "The theory behind the rule espoused in these cases is that indemnity is a separate equitable cause of action; while contract or tort liability may be 'secondarily . . . involved' in such suits, indemnity is not dependent on those theories." *Id.* (citing City of Willmar v. Short-Elliott-Hendrickson, Inc., 512 N.W.2d 872 (Minn.1994)). However, neither the Supreme Court of Pennsylvania or Supreme Court of New Jersey have answered the question of whether UCC § 2-725 applies to express indemnity claims.

To the extent a state law question is undecided, a federal court sitting in diversity must make the best prediction, even in the absence of direct state precedent, of what the state supreme court would do if it were confronted with the question. *Combs v. International Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004).

### 1. Indemnity claims under Pennsylvania law

Under Pennsylvania common law, a claim for indemnity generally accrues when

---

[38]APU explains that these dates were well within the limitations period and identifies the dates as follows: Paoli settlement with Assignors, payment due by 11/24/2004; Paoli Consent Decree entered on 9/16/2005; South Amboy Settlement Agreement, payment by 12/31/2007; Sunnyside Settlement Agreement dated 9/26/2007; and APU has not yet made its final payment with regard to the Wilmington Yard.

"liability is fixed by a judgment against, or payment in settlement by, the indemnitee."
*Thermo King Corp. v. Strick Corp.*, 467 F.Supp. 75, 77 (W.D.Pa. 1979).  Under the UCC,
a claim for indemnity accrues when a breach of the contract occurs, regardless of the
aggrieved party's lack of knowledge of the breach.[39]

The Court has uncovered three decisions where the court addressed the issue of
whether the UCC statute of limitations applies to claims for indemnity under Pennsylvania
law.  *See Berg Chilling Sys. Inc. v. Hull Corp.*, 2002 WL 31681955 (E.D. Pa. Nov. 26,
2002); *Titanium Metals Corp. v. Elkem Management, Inc.*, 87 F.Supp.2d 429 (W.D. Pa.
1998); *Thermo King Corp. v. Strick Corp.*, 467 F.Supp. 75 (W.D. Pa. 1979).  In all three
decisions, the courts did not apply the UCC statute of limitations.  The Court predicts that
the Supreme Court of Pennsylvania would likewise hold that the UCC does not apply to
such claims.  Accordingly, the Court finds that APU's contractual indemnity claims under
Pennsylvania law are not barred by the statute of limitations in UCC § 2-725.  Therefore,
GE is not entitled to summary judgment on this basis.

---

[39]The Supreme Court of Pennsylvania has explained the policy behind this provision:

Section 2725 of the UCC represents an attempt by the drafters, and by our General
Assembly, to accommodate the legitimate needs and expectations of the "sellers"
and "buyers" (or vendors/purchasers, lessors/lessees) dealing in goods.  *See*
Williams, The Statute of Limitations, Prospective Warranties, and Problems of
Interpretation in Article Two of the UCC, ("Williams") 52 G.W.L.Rev. 67, 68 (1983).
As with all statutes of limitations, the major purpose of a given "cut-off" date for
claims is the repose of stale claims.  The drafters of section 2725 decided on a four
year statute of limitations from the tender of delivery (rather than from the
time-of-discovery of the breach) primarily to favor the interests of the seller in being
able to "close the books" on a given transaction. *See* Williams, *supra* at 100-01,
76-82.  Thus, the potential liability of most sellers would be reasonably certain as
of four years from the date the goods were delivered.

*Cucchi v. Rollins Protective Services Co.*,  574 A.2d 565, 573 (Pa. 1990).

## 2.   Indemnity claims under New Jersey law

As a general rule, under New Jersey law, a claim for indemnity under a contract does not accrue until the liability is fixed by a judgment against or payment by the indemnitee.  *United New York Sandy Hook Pilots Ass'n v. Rodermond Indus., Inc.*, 394 F.2d 65, 75 (3d Cir. 1967).

The parties have not cited, and the Court has not found, a decision where a New Jersey court has directly addressed the issue of the applicability of UCC § 2-725 to contractual indemnity claims.  APU does cite to *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238 (3d Cir. 2010).  However, the Third Circuit merely affirmed the district court's finding that the indemnitee could not state an express indemnification claim based on first-party damages, that is, damages of the indemnitee itself.  594 F.3d at 256.  The court also affirmed the district court's finding that the indemnitee had failed to state an indemnity claim based on third-party damages because there was no allegation that such damages existed.  *Id.*  However, the court did state, without specifically deciding, that New Jersey's six-year statue of limitations applies to express contractual indemnification.  *Id.* at 254 (citing N.J. Stat. Ann. § 2A:14–1; *First Indem. of America Ins. Co. v. Kemenash*, 744 A.2d 691, 696 (2000)).[40]

---

[40]The court also acknowledged that the district court found that to the extent the indemnification claim sought first-party damages, it was governed by governed by contract principles and consequently time-barred under the UCC's four-year statute of limitations.  *Id.* at 254.  However, because both the district court and the Third Circuit found that an indemnification claim for first-party damages did not exist under New Jersey law, this statement provides little guidance.

This Court notes that the case cited by the Third Circuit in support of the proposition that New Jersey's six-year statute of limitations applies, *First Indem. of America Ins. Co. v. Kemenash*, 744 A.2d 691 (2000), did not involve a contract for the sale of goods.

Accordingly, the Court finds that the New Jersey Supreme Court would find that the UCC does not apply to express indemnity claims. Therefore, APU's contractual indemnity claims under New Jersey law are not barred by the statute of limitations in UCC § 2-725. Therefore, GE is not entitled to summary judgment on this basis.

## IV.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Defendant General Electric Company's Motion for Summary Judgment on Statute of Limitations Issues (Doc. 91) is **GRANTED in PART and DENIED in PART**. APU's remaining claims are as follows: Count I – cost recovery and declaratory relief under CERCLA § 107(a) based on removal activity at the Sunnyside and Wilmington site; Count III – contribution and declaratory judgment under CERCLA § 113(f) based on certain costs incurred at the Paoli site; Count IV – contractual indemnification relating to the Silverliner IV cars; Count V – contractual indemnification relating to the Jersey Arrow II cars; Count VII – contribution under the PHSCA based on certain costs incurred at the Paoli site; Count XI – trespass at the Wilmington site under Delaware law; Count XII – negligence at the Wilmington site under Delaware law; Count XIII – private nuisance at the Wilmington site under Delaware law; Count XIV – public nuisance at the Wilmington site under Delaware law; Count XV – abnormally dangerous activity at the Wilmington site under Delaware law; Count XVI – strict liability at the Wilmington site under Delaware law; Count XVII negligent design at the Wilmington site under Delaware law; Count XVIII – negligent manufacture at the Wilmington site under Delaware law; Count XIX – failure to warn at the Wilmington site under Delaware law; Count XXII – punitive damages; and Count XXIII – assignment of

SEPTA, Amtrak and Conrail's claims.

**IT IS SO ORDERED.**

_/s/ Michael R. Barrett_
Michael R. Barrett, Judge
United States District Court