**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

American Premier Underwriters Inc.,

       Plaintiff,

       v.                         Case No. 1:05cv437

General Electric Company,                Judge Michael R. Barrett

       Defendant.

**OPINION & ORDER**

    This matter is before the Court on Plaintiff American Premier Underwriters, Inc.'s ("APU") Motion for Partial Summary Judgment on the Issue of Defendant's Indemnification Liability. (Doc. 93.) Defendant General Electric ("GE") has filed a Response in Opposition (Doc. 104), and APU filed a Reply (Doc. 141).[1]

**I.    BACKGROUND**

    Plaintiff APU is the successor to the Penn Central Transportation Company ("Penn Central"). This action arises from contamination at four rail yards operated by Penn Central prior to April 1, 1976: (1) the Paoli Yard, located in Paoli, Pennsylvania; (2) the South Amboy Yard, located in South Amboy, New Jersey; (3) Sunnyside Yard, located in Long Island, New York; and (4) Wilmington Shops and related facilities, located in Wilmington, Delaware. During the period when Penn Central operated these rail yards, it owned and used passenger rail cars with transformers manufactured by GE. APU claims the GE transformers contaminated the rail yards by leaking polychlorinated biphenyls

---

[1]To the extent that the parties have addressed the issues surrounding APU's contractual indemnification claims in the briefing of GE's Motion for Summary Judgment (Doc. 92), the Court has considered those arguments in reaching its decision.

("PCBs").

Following this Court's ruling on GE's Motion to Dismiss (Doc. 60) and GE's Motion for Summary Judgment on Statute of Limitations Issues (Doc. 151), APU's remaining claims are as follows: Count I – cost recovery and declaratory relief under CERCLA § 107(a) based on removal activity at the Sunnyside and Wilmington site; Count III – contribution and declaratory judgment under CERCLA § 113(f) based on certain costs incurred at the Paoli site; Count IV – contractual indemnification relating to the Silverliner IV cars; Count V – contractual indemnification relating to the Jersey Arrow II cars; Count VII – contribution under the PHSCA based on certain costs incurred at the Paoli site; Count XI – trespass at the Wilmington site under Delaware law; Count XII – negligence at the Wilmington site under Delaware law; Count XIII – private nuisance at the Wilmington site under Delaware law; Count XIV – public nuisance at the Wilmington site under Delaware law; Count XV – abnormally dangerous activity at the Wilmington site under Delaware law; Count XVI – strict liability at the Wilmington site under Delaware law; Count XVII negligent design at the Wilmington site under Delaware law; Count XVIII – negligent manufacture at the Wilmington site under Delaware law; Count XIX – failure to warn at the Wilmington site under Delaware law; Count XXII – punitive damages; and Count XXIII – assignment of SEPTA, Amtrak and Conrail's claims.

APU's Motion for Partial Summary Judgment is only directed toward the contractual indemnification claims.  These claims are based upon two contracts which date back to 1971.  The first contract was between GE and the New Jersey Department of Transportation ("NJDOT") for 70 Jersey Arrow II rail cars ("the NJDOT Contract").  The second contract was between GE and Southeastern Pennsylvania Transportation Authority

("SEPTA") for 144 Silverliner IV rail cars ("the SEPTA Contract").  Under separate lease agreements with NJDOT and SEPTA, Penn Central agreed to use the rail cars to service commuter rail lines in New Jersey and Pennsylvania.  (See, e.g., Doc 95-1, at 3.)

Under the NJDOT and SEPTA Contracts, GE agreed to "design, construct, test, deliver and guarantee" the rail cars.  Both Contracts included an indemnity provision which is virtually identical[2] and provides:

> . . . Contractor [GE] hereby assumes all risk and responsibility and shall indemnify and save . . . the Railroad [Penn Central] harmless from any and all claims, suits, demands, and causes of action of any kind or nature whatsoever, and expenses incidental thereto, including, but not limited to counsel fees, for the loss of life or property or injury or damage to the person or property of any person or corporation whatsoever, (including, but without limitation of the foregoing, the person or property of the Contractor, or its Subcontractors, [SEPTA/NJDOT] and/or the Railroad and their respective officers agents, or employees), caused by the Contractor in the manufacture, testing, inspection or repair of any of the cars, or any part thereof, whether occurring prior to or after acceptance of such car by [SEPTA/NJDOT] from the Contractor and whether occurring on or off the premises of the Railroad. . . .The Contractor shall further assume all liability for loss by reason of neglect or violation of federal, state or local laws, ordinances or regulations, and all work necessary to conform to said laws, ordinances, and regulations is included in this Contract.

(Doc. 95-1, at 59-60; Doc. 95-2, at 125-27.)  APU claims that these indemnification provisions unambiguously require GE to indemnify APU, as successor to "the Railroad," for all costs associated with PCB contamination caused by the Jersey Arrow II and Silverliner IV rail cars.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if

---

[2]The differences are that "NJDOT" is substituted for "SEPTA," "State of New Jersey" is substituted for "Commonwealth of Pennsylvania," and the reference to "the City of Philadelphia" is omitted.

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving part has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id*. at 252.

III.  **ANALYSIS**

The parties are in agreement that New Jersey and Pennsylvania law govern APU's contractual indemnification claims.[3]  The parties also recognize that the law of both states provides that unambiguous contracts are interpreted by the court as a matter of law.  *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 469 (Pa. 2006); *Cooper River Plaza East, L.L.C. v. Briad Group*, 820 A.2d 690, 696 (N.J. Super. Ct. App. Div. 2003)*; see also Englert v. The Home Depot*, 911 A.2d 72, 77 (N.J. Super. Ct. App. Div. 2006) ("Indemnity contracts are interpreted in accordance with the rules governing the construction of contracts generally.").

GE argues that APU is not entitled to summary judgment for the following reasons:

---

[3]The contract between GE and SEPTA provided that the meaning, validity and effect of the contract was to be determined by Pennsylvania law.  Likewise, the contract between GE and NJDOT provided that meaning, validity and effect of the contract was to be determined by New Jersey law.

-4-

(1) APU's claims are untimely under Ohio's savings statute; (2) APU assigned its rights under the NJDOT and SEPTA contracts to Conrail in 1976, and therefore has no standing to assert a contract claim; (3) in the alternative, if APU did not assign its rights, its claims are subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Pennsylvania under the Consummation Order that court issued in 1978 in the Penn Central bankruptcy proceeding; (4) the claims are subject to mandatory arbitration, which APU has not pursued; (5) the plain language of the indemnity provision makes clear that it does not apply to in-service events such as transformer fluid leaks; and (6) as with the CERCLA claims, APU's recoveries from collateral sources offset any possible recovery on a contract theory.

A.     **Timeliness**

In ruling on GE's Motion for Summary Judgment on Statute of Limitations Issues, this Court concluded that the contracts are governed by the general statute of limitations for indemnity contracts under Pennsylvania and New Jersey law.  (Doc. 151, at 51, 53.) Under that law, APU argues its contractual indemnification claims did not accrue until the final payments were made for clean up costs at the sites, and therefore the claims are timely under Pennsylvania's four-year statute of limitations and New Jersey's six-year statute of limitations.[4]

However, GE notes that Ohio's borrowing statute, Ohio Revised Code 2305.03(B)

---

[4]APU explains that the final payments were made well within the limitations period and identifies the dates as follows: Paoli settlement with Assignors, payment due by 11/24/2004; Paoli Consent Decree entered on 9/16/2005; South Amboy Settlement Agreement, payment by 12/31/2007; Sunnyside Settlement Agreement dated 9/26/2007; and APU has not yet made its final payment with regard to the Wilmington Yard.

requires this Court to apply any Ohio statute of limitation if Ohio provides a shorter period

of limitation than Pennsylvania or New Jersey law. GE argues that under Ohio's savings

statute, Ohio Revised Code § 2305.19(A), a party has one year to re-file any claim that is

dismissed for a reason other than the merits. GE points out that APU filed suits against

GE for indemnification in 1990 and 1994. (See Docs. 104-7 & 104-8.)

APU responds that Section 2305.19(A) is not applicable because APU's prior claims

were asserted during the Paoli Yard tort litigation, which involved individual plaintiffs

seeking personal injury tort damages allegedly caused by being exposed to PCBs while

living near or working at the Paoli Yard. APU explains that its contingent claims against

GE were very limited.

Ohio's savings statute, Ohio Revised Code § 2305.19, provides:

> In any action that is commenced or attempted to be commenced, if in due
> time a judgment for the plaintiff is reversed or if the plaintiff fails otherwise
> than upon the merits, the plaintiff or, if the plaintiff dies and the cause of
> action survives, the plaintiff's representative may commence a new action
> within one year after the date of the reversal of the judgment or the plaintiff's
> failure otherwise than upon the merits or within the period of the original
> applicable statute of limitations, whichever occurs later. This division applies
> to any claim asserted in any pleading by a defendant.

Ohio Rev. Code § 2305.19(A). The Ohio Supreme Court had explained that "[t]he savings

statute applies when the original suit and the new action are substantially the same."

*Children's Hospital v. Ohio Dept. of Public Welfare*, 433 N.E.2d 187, 188 (Ohio 1982).

Ohio courts have explained that "[a] new complaint is substantially the same as the original

complaint for purposes of the saving statute when the new complaint differs only to the

extent that it adds new recovery theories based upon the same factual occurrences stated

in the original complaint." *Stone v. N. Star Steel Co.*, 786 N.E.2d 508, 512 (Ohio Ct. App.

2003) (and cases cited therein); *see also Lanthorn v. Cincinnati Ins. Co.*, 2002 WL 31768796, *4 (Ohio Ct. App. Dec. 5, 2002) ("Whether a new action is substantially the same as an original action for purposes of the savings statute does not always depend on whether the original action set forth the same legal theories as those asserted in the new complaint.  Instead, the question largely turns on whether the original complaint and the new complaint contain similar factual allegations so that it can reasonably be said that the party or parties were put on fair notice of the type of claims that could be asserted.").

This Court finds that the claims filed by APU in 1990 and 1994 are not substantially the same as the present action.  While the parties may be the same, and both the previous action and this action involve a theory of indemnity, the underlying source of liability is different.  In the previous litigation, the plaintiffs brought claims against APU for personal injuries allegedly caused by exposure to PCBs at the Paoli Yard.  The litigation before this Court is based upon the contamination of four rail yards, one of which is the Paoli Yard. Therefore, Ohio's savings statute is inapplicable in this instance, and APU's contractual indemnification claim is timely.

**B.**  **Standing**

GE argues that APU does not have standing to bring a claim under the NJDOT and SEPTA Contracts because APU assigned the Contracts to Conrail in 1976.

The parties have explained that in the early 1970s, Penn Central and other major railroads in the Northeast entered bankruptcy.  Congress responded, and created Conrail for the purpose of operating certain properties owned by the bankrupt railroads.[5]

---

[5]As one district court has explained:

On March 30, 1976, the Reorganization Trustees, on behalf of Penn Central, executed a "Bill of Sale and Assignment" which conveyed to Conrail: real property (including the four railyards involved here), leases, equipment, contracts, and other properties necessary for Conrail to operate Penn Central's railway.  (Doc. 104-4.)  GE relies on two provisions of the Bill of Sale.  The first provision is Schedule E, which applies to executory contracts and agreements:

---

Beginning in the late 1960s, "[a] rail transportation crisis seriously threatening the national welfare was precipitated when eight major railroads in the northeast and midwest region of the country entered reorganization proceedings under § 77 of the Bankruptcy Act." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 108, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).  "Congress concluded that solution of the crisis required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation." *Id.* at 341-42. To implement this solution, "Congress supplemented § 77 with the Rail Act, which became effective on January 2, 1974." *Id.* at 342.  As one senator remarked, the Rail Act was "intended to wipe the slate clean, to allow these rail systems to correct mistakes that led them into financial collapse and to enable them to start anew and continue on a profitable basis." 119 Cong. Rec. S23,784 (daily ed. Dec. 21, 1973) (statement of Sen. Long).

The Rail Act created a government corporation, the United States Railway Corporation ("USRA"), tasked with creating a Final System Plan for restructuring the railroads. 45 U.S.C. § 716(a)(1).  The Final System Plan, published by the USRA in July 1975, designated certain rail properties held by the railroads in reorganization for transfer to a newly-formed private corporation, Conrail. . . . 45 U.S.C. § 741(d).  As required by the Rail Act, the USRA submitted the Final System Plan to Congress, which approved the plan shortly thereafter.  . . . 45 U.S.C. § 718(a).

The Rail Act also called for the creation of a Special Court, which would have exclusive jurisdiction over proceedings relating to the Final System Plan.  45 U.S.C. § 719.  Following Congress's approval of the Final System Plan, the Special Court would issue conveyance orders, directing the trustee of each railroad in reorganization to convey all right, title and interest in the designated rail properties to Conrail. 42 45 U.S.C. § 743(b)(1).  The Rail Act required that "[a]ll rail properties conveyed to [Conrail] . . . be conveyed free and clear of any liens or encumbrances." *Id.* § 743(b)(2).

*Consol. Rail Corp. v. Ray, ex rel. Boyd*, 693 F. Supp. 2d 39, 41-42 (D.D.C. 2010) (footnotes omitted).

> Grantor's rights of whatever name or nature, in law or in equity, in, under and to each and every contract to which Grantors or their predecessors in interest are or were parties and which is in effect on the date hereof and which is used or useful in the provision of rail services to be assumed by Grantee in connection with the properties conveyed to Grantee by this Bill of Sale and Assignment and the properties identified in Schedule A, except as hereinafter provided.

(Doc. 104-4, at 19.)  GE also relies on Schedule H, which applies to rights, powers, franchises, privileges and immunities:

> To the extent not conveyed to Grantee by the execution and delivery of conveyance documents certified by USRA to the Special Court in connection with the properties identified in Schedule A, all rights, powers, franchises, licenses, easements, privileges and immunities . . . which Grantor may own, possess or enjoy, granted by any person, corporation or other entity, including but not limited to any governmental body of authority, whether federal, state of local, by permit, license, statute, ordinance or otherwise, which are used or useful in the provision of rail services assumed by Grantee in connection with the properties conveyed to Grantee by this Bill of Sale and Assignment or identified in Schedule A.

(Id. at 33.)  GE argues that these provisions do not carve out the indemnity provisions of the NJDOT and SEPTA Contracts, and therefore Penn Central conveyed its rights under those indemnity provisions to Conrail.

APU responds that while the NJDOT and SEPTA Contracts were not expressly included or excluded from the Bill of Sale, the plain language of Schedule E provides that assignment is limited to contracts "to which Grantors or their predecessors in interest are or were parties . . ."  (Id. at 19.)  APU points out that neither Penn Central nor its Reorganization Trustees were parties to the NJDOT and SEPTA Contracts.

However, Schedule H is broadly written.  Under this provision, Penn Central conveys "all rights, powers, franchises, licenses, easements, privileges and immunities . . .  which are used or useful in the provision of rail services."

-9-

Relying on other language found in Schedule H, APU argues that a distinction should be made between events occurring before and after Conrail took over operations on April 1, 1976. APU cites to the provision in Schedule H which states: "Grantee [Conrail] assumes no other liabilities or obligations of any kind of Grantor [Penn Central] arising out of or in connection with the foregoing rights, powers, franchises, licenses, easements, privileges or immunities or any property which is the subject thereof, which have accrued prior to the date of delivery hereof or which thereafter arise out of events which have occurred prior thereto." (Id. at 33.) APU points out that its CERCLA liability was imposed retroactively for contamination which occurred before April 1, 1976, and it retained the right to seek indemnification for liability which arose before that date.

While APU is correct to note the distinction between events which occurred before and after April 1, 1976, the plain language of the provision cited by APU is clear that this distinction is in reference to "*liabilities or obligations* . . . which have accrued prior to the date of delivery hereof or which thereafter arise out of events which have occurred prior thereto." (Id.) The indemnity provision in the NJDOT and SEPTA Contracts cannot be read by this Court to create a liability or obligation on the part of APU, but instead provides that GE will "indemnify and save . . . the Railroad [Penn Central] harmless from any and all claims, suits, demands, and causes of action of any kind or nature whatsoever . . ." Therefore, the Court concludes that under the broad language in Schedule H, Penn Central conveyed its right to enforce the indemnity provisions in the NJDOT and SEPTA Contracts to Conrail.

APU argues that even if the Bill of Sale and Assignment conveyed or assigned Penn Central's third-party beneficiary rights under the NJDOT and SEPTA Contracts to Conrail,

Conrail expressly assigned those rights back to APU on November 8, 2004 in the Paoli Rail Yard Settlement Agreement. (Doc. 96-3, at 35.) APU points to the language in the Paoli Rail Yard Settlement Agreement which states that Conrail assigns "any and all claims relating to the Paoli Rail Yard Site, if any, against General Electric Company." (Id. at 39.) GE responds that this argument is "correct as far as it goes," but posits that APU has already been made whole for its Paoli-related expenses and cannot maintain a contract indemnity claim based on these same expenses. This argument goes to the merits of APU's claim, which GE raises in its Motion for Summary Judgment on the Merits.[6] The Court declines to address that issue at this time, and instead chooses to address it in its ruling on GE's Motion for Summary Judgment. At this juncture, the Court concludes that APU has standing to bring its claims for contractual indemnification, but only so far as those claims relate to the Paoli Yard Site.[7]

C.    **Jurisdiction**

GE argues that what remains of APU's contractual indemnification claims is subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Pennsylvania, which was the Reorganization Court in the Penn Central bankruptcy

---

[6]In its Reply, APU clarifies that it is only seeking partial summary judgment on the issue of liability and is not seeking a determination regarding damages in its motion. (Doc. 141, at 28.)

[7]While the parties have not addressed the issue, based on the Court's understanding of the record, APU's claim could only be based on the SEPTA Contract. The Court takes judicial notice that Paoli, Pennsylvania is located in Chester County, which is one of the counties for which Penn Central agreed to provide service under its agreement with SEPTA. (See Doc. 95-1, at 4.) Under the agreement with NJDOT, Penn Central agreed to provide service primarily within New Jersey. However, for the sake of completeness, the Court will address the remainder of parties' arguments as if the NJDOT Contract still forms the basis of APU's contractual indemnification claim.

proceeding.

In June of 1970, Penn Central filed a petition for bankruptcy in the Reorganization Court. On August 17, 1978, the court issued its Consummation Order and Final Decree. (Doc. 92-9.) GE relies on Section 7.04 of the Consummation Order, which sets forth the Reorganization Court's "Reservation of Jurisdiction." GE specifically relies on the following language:

> From and after the Consummation Date [October 24, 1978], the Court hereby reserves jurisdiction, which shall be exclusive to the extent that under applicable law such jurisdiction is presently exclusive:
>
> . . . .
>
> (e) To consider and act in respect of any claim of any of the Debtors or Trustees, in respect of any petition or matter pending before the Court as of the Consummation Date or in respect of any agreement or matter to which any of the Trustees or Debtors is a party, as to which the Court presently has asserted jurisdiction and which has not been adjudicated, discharged, resolved or terminated as of the Consummation Date.

(Doc. 40, at 80-81.) GE cites several cases in which APU successfully argued that the exclusive-jurisdiction provision of the Consummation Order must be decided by the Reorganization Court. *See United States v. Am. Premier Underwriters, Inc.*, No. 05-12189-RWZ, 2006 WL 1888322 (D. Mass. July 10, 2006); *N.J. Transit Corp. v. Am. Premier Underwriters, Inc.*, No. 04-6423 (D.N.J. Nov. 23, 2005) (unpublished order); *Providence & Worcester R.R. v. Penn Cent. Corp.*, No. 88-2119-MC, 1989 WL 73308 (D. Mass. June 28, 1989).

However, the indemnity provision which forms the basis of APU's contractual indemnification claims appeared in the NJDOT and SEPTA Contracts, which was not an "agreement or matter to which [APU] is a party."

-12-

As to the contractual indemnification claims themselves, there is nothing in the record indicating that the Reorganization Court "asserted jurisdiction" over these claims. APU has argued, and GE has not disputed, that the contractual indemnification claims accrued when the final payments were made for clean up costs at the sites.[8]  According to APU, the claims for the Paoli Yard site accrued on the date payment was due for the Paoli settlement with Assignors (11/24/2004) and the date of the Paoli Consent Decree (9/16/2005).  Because these dates are well after the Consummation Date of August 17, 1978, this Court concludes that APU's contractual indemnification claims are not subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Pennsylvania.

### D.    Arbitration

GE argues that any claim for contractual indemnification is subject to mandatory arbitration, which APU has not pursued.  GE relies on Article 17 of the NJDOT and SEPTA Contracts which provides:

> Authority of Engineer: The Engineer shall make all necessary explanations and interpretations as to the meaning and intention of the Contract Drawings and Specifications; shall give all orders and directions contemplated under this Contract; shall determine in all cases the amount, quality, acceptability and fitness of the several kinds of work which are to be performed or furnished under this Contract, shall determine all questions in relation to said Work and shall decide every question which may arise relative to the fulfillment of this Contract on the part of the Contractor.

(Doc. 95-1, at 53-54; Doc. 95-2, at 121.)  "Engineer" is defined in both Contracts as "that person who shall be the agent of [NJDOT/SEPTA] and designated as Engineer by

---

[8]Instead, GE argued that the Uniform Commercial Code applied to these claims, and the four year statute of limitations began to run at delivery.  However, this Court determined that the UCC did not apply to APU's contractual indemnification claims.  (Doc. 151, at 51, 53.)

[NJDOT/SEPTA]."  (Doc. 95-1, at 39; Doc. 95-2, at 107.)  "Work" is defined as "all the matters and things herein agreed to be furnished or done by or on the part of the Contractor."  (Doc. 95-1, at 40; Doc. 95-2, at 108.)  The scope of the Work is as follows: "Briefly described, the work to be performed by the Contractor is to design, construct, test, deliver and guarantee Electrical Multiple-Unit Commuter Railway Cars."  (Doc. 95-1, at 39; Doc. 95-2, at 107.)

GE claims that Article 17 is an agreement to arbitrate contract claims against GE, and the Engineer is the decisionmaker.  GE argues that as a third-party beneficiary of the NJDOT and SEPTA Contracts, APU is bound by the arbitration provisions.

APU responds that the purpose of Article 17 was limited, and the role of the Engineer was to explain and interpret the contract drawings and specifications, and to make decisions regarding the fulfillment of GE's duties under the Contracts.  APU points out that GE fulfilled its duties by 1976, when the Contracts were complete.

Under the Federal Arbitration Act: "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The United States Supreme Court has described this provision as reflecting a "liberal federal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (quoting Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  However, the Sixth Circuit has clarified that "that no matter how strong the federal policy favors arbitration, 'arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit

-14-

to arbitration.'" *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (quoting United Steelworkers, Local No. 1617 v. Gen. Fireproofing Co., 464 F.2d 726, 729 (6th Cir. 1972)). "It is well settled in both commercial and labor cases that whether parties have agreed to 'submi[t] a particular dispute to arbitration' is typically an 'issue for judicial determination.'" *Granite Rock Co. v. Int'l Broth. of Teamsters*, 130 S. Ct. 2847, 2855 (2010) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)). In this instance, the Court concludes that the parties did not agree to submit APU's contractual indemnification claims to arbitration.

To begin, the SEPTA Contract includes a provision which does not appear in the NJDOT Contract:

> Article 24 - Arbitration: All decisions and interpretations of the Engineer shall be final and binding, subject only to arbitration as hereafter provided, as to whether such decisions or interpretations were "arbitrary or unreasonable."

(Doc. 95-1, at 64.) In this respect, the two Contracts differ, in that one expresses an intent to arbitrate "decisions and interpretations of the Engineer," while the other is silent. However, for the reasons that follow, the Court concludes that this difference has no bearing on whether the APU's contractual indemnification claims fall within the scope of any agreement to arbitrate.

Both the Supreme Court of New Jersey and the Supreme Court of Pennsylvania have interpreted similar provisions which include the same language found in Article 17: "The Engineer . . . shall determine in all cases the amount, quality, acceptability and fitness of the several kinds of work which are to be performed or furnished under this Contract, shall determine all questions in relation to said Work and shall decide every question which may arise relative to the fulfillment of this Contract on the part of the Contractor." As one

New Jersey appellate court explained:

> Such a stipulation is a common one in modern construction contracts and decisions made thereunder by the person named have long since been regarded as dispositive of disputes between the parties, in the absence of clear proof of fraud upon the part of such person.

*Terminal Const. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.*, 112 A.2d 762, 767 (N.J. Super. Ct. App. Div. 1954) (see also cases cited therein).[9]

Accordingly, the Supreme Courts of New Jersey and Pennsylvania have in the past interpreted this type of language as creating something akin to an arbitration agreement.[10]

*Terminal Const. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.*, 113 A.2d 787, 797, 798 (N.J. 1955) ("Engineer control provisions in this field of construction contracts are regarded as dispositive of disputes between the parties in the absence of

---

[9]In *Terminal Construction*, the agreement provided that the engineer was "to make final and conclusive decisions with respect to the meaning and intent of the specifications and drawings, the amount, quality, acceptability and fitness of the several kinds of work which were to be paid for, all questions in relation to the work and the construction thereof and relative to the fulfillment of the contract by the contractor." 112 A.2d at 766.

[10]As the New Jersey appellate court in *Terminal Construction* explained:

It is only necessary to recall the original and then the changing attitude of the courts toward arbitration clauses in contracts to realize that the modern view is to permit competent parties bargaining at arms' length to make their own binding stipulations with regard to the subject matter of their negotiations, unless some strong public policy operates as a bar. Therefore it is our view that where such a contract confers that *quasi*-judicial authority on an engineer to make a binding construction of the language thereof in the absence of fraud or arbitrary action, his interpretation should be considered final in any case where the meaning of the language is ambiguous. This would seem to be consonant with the philosophy represented by our Arbitration Act, N.J.S. 2A:24–1 et seq., N.J.S.A., even though strictly speaking the engineer's action is not such an arbitration. However, where the language is clear and a dispute arises as to its significance, the engineer, even if acting in good faith, cannot construe it contrary to its unmistakable connotation or contrary to any fixed meaning that the language has in the law or in trade usage.

*Terminal Const. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.*, 112 A.2d at 776 (citations omitted).

-16-

clear proof of fraud upon the part of the engineer."); *Ruch v. York City*, 81 A. 891, 894 (Pa.

1911) ("It is settled in this state that the parties to a building or construction contract may

legally provide therein that disputes arising out of the contract shall be submitted for

decision to the architect or engineer, and that his conclusion or judgment shall be a final

adjudication of the questions submitted.").[11]   As the Supreme Court of Pennsylvania

explained:

> Technical words are not required to make a binding reference, and the form
> of submission is not important, if it clearly appears that the intent was to
> submit differences to arbitration, and to abide by the award.  An agreement
> to submit to arbitration may carry with it, by implication, the further
> agreement to abide by the award.  "The very act of submission," it was said
> in McManus v. McCulloch, 6 Watts, 357, "implies a promise by the party to
> abide by the determination of the person to whom the matter is referred."
> That the award should be final was the very purpose of the reference.  It was
> "to prevent all disputes and litigation."  If not final, it would prevent nothing,
> and would be the beginning, and not the end, of litigation.

*Somerset Borough v. Ott*, 56 A. 1079, 1080 (Pa. 1904).  However, as the Supreme Court

of Pennsylvania also explained:

> But while an award made on any subject embraced within the clause of the
> agreement would be binding on the parties, and conclusive of their rights, a
> too wide construction was given the agreement.  An agreement to submit
> questions that may arise as to the fulfillment of a contract does not give the
> right to pass on a claim for damages for nonfulfillment.  Such an agreement
> is not to be extended by implication beyond its plain words.  The agreement
> gave the engineer power to determine finally all questions arising as to the
> amount and quality of the work done, and as to the performance of the

---

[11]In *Ruch*, the agreement provided that: "All the work * * * shall be done to the
satisfaction of the engineer, who shall in all cases determine the amount, quality, acceptability
and fitness of the several amounts of work and materials, * * * and shall decide all questions
which may arise as to the measurement of quantities and the fulfillment of this contract, * * *
and shall determine all questions respecting the true construction or meaning of the plans and
specifications, and his determination and decision thereon shall be final and conclusive; and
such determination and decision in case any question shall arise shall be a condition precedent
to the right of the contractor to receive any money hereunder." 81 A. at 894.

contract. These questions were to be decided by reference to the specifications, with the aid of his presumed expert knowledge. But the power to decide whether work has been done in accordance with a contract, and whether a contract has been completed in accordance with its terms, cannot, by implication, be enlarged so as to include the right to determine what shall be paid by way of damages for nonfulfillment.

*Id.* In addition, a later interpretation of Pennsylvania law with regards to these types of clauses was as follows:

Nor can there be any doubt that the determination of a claim for damages for breach of contract is a judicial function. In Philadelphia Housing Authority v. Turner Construction Company, 1942, 343 Pa. 512, 519, 23 A.2d 426, 429, the court had this critical comment on the question as to whether persons connected with one of the parties to a dispute can properly perform such a judicial function,

"* * * Provisions in contracts which give engineers or architects or heads of municipal or state departments power to decide questions are not arbitration provisions in the sense that the Arbitration Act provides. Boards of arbitration under that act are judicial bodies. Individuals given the right to decide in their own favor or in favor of the person who employs them cannot be said to be exercising a judicial function at all. They exercise a power given them by the contract to decide, not to judicially hear and determine."

*Badgett Mine Stripping Corp. v. Pennsylvania Tpk. Comm'n*, 173 F. Supp. 425, 430 (M.D. Pa. 1959) (concluding that damages resulting from breaches of contract by defendant are not referable to arbitration under the arbitration provision of the contract relating to measurement and payment).

Therefore, the Court concludes that APU's claims for contractual indemnification are not subject to mandatory arbitration.

### E.     Applicability to CERCLA claims

GE next argues that the plain language of the indemnity provisions in the SEPTA and NJDOT Contracts makes it clear that the indemnity provisions not apply to in-service

events such as transformer fluid leaks. GE cites the language which states that the provisions apply to damage "caused by the Contractor in the manufacture, testing, inspection or repair of any of the cars, or any part thereof." However, the provisions go on to state that the provision are applicable "whether occurring prior to or after acceptance of such car by [SEPTA/NJDOT] from the Contractor and whether occurring on or off the premises of the Railroad." The Court concludes that this language indicates that the indemnification continues after the rail cars are complete and put into service. This interpretation is bolstered by language which carves out indemnification "to any fare-paying passenger injured while in a regular passenger car of a train for passengers generally of the Railroad or in and about the station premises as an intended fare-paying passenger of the Railroad." *Accord Newark Publishers' Ass'n v. Newark Typographical Union, No. 103*, 126 A.2d 348, 352-53 (N.J. 1956) ("Words and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose; and thus the literal sense of terms may be qualified by the context."); *Laudig v. Laudig*, 624 A.2d 651, 653 (Pa. 1993) (explaining that the paramount goal of contract interpretation is to ascertain and give effect to the parties' intent, and to accomplish this goal, each and every part of the contract must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument) (citations omitted).

Therefore, the indemnity provisions in the SEPTA and NJDOT contracts would apply to in-service events such as transformer fluid leaks.

### F.     Remaining arguments

The parties' remaining arguments address the merits of APU's contractual indemnification claims.

APU argues that under New Jersey and Pennsylvania law, it was permitted to settle a claim for reasonable amount, and then recover that amount from an indemnitor.  GE argues that the settlement amounts were not reasonable, and in addition, APU failed to give GE notice of the underlying lawsuits.

Under New Jersey law, "[a] party may be indemnified for settlement payments it makes provided that the following three criteria are met: "(a) the indemnitee's claims are based on a valid, pre-existing indemnitor/indemnitee relationship; (b) the indemnitee faced potential liability for the claims underlying the settlement; and (c) the settlement amount was reasonable." *Chem. Bank of N.J. Nat'l Ass'n v. Bailey*, 296 N.J.Super. 515, 524-25, 687 A.2d 316 (N.J. Super. Ct. App. Div. 1997).  Similarly, under Pennsylvania law, "[t]o establish a right to indemnification where a case is resolved by settlement, the party must establish that the settlement was reasonable, that the underlying claim was valid against it, that the claim is within the coverage of the agreement, and that any counsel fees were reasonable."  *McClure v. Deerland Corp*., 585 A.2d 19, 22 (Pa. 1991).

The Court concludes that there is a genuine issue of material fact as to whether the amount in the Paoli Yard settlement was reasonable.  As to the issue of notice, under Pennsylvania case law, the failure to give notice of the litigation, or the settlement, is not fatal and does not constitute a waiver of the indemnitee's right to pursue its claim. *Ultramed, Inc. v. Beiersdorf-Jobst, Inc*., 98 F. Supp. 2d 609, 611 (M.D. Pa. 1998).  Instead,

"if no notice is given, an indemnitee has the burden of justifying the payment of damages by offering against the indemnitor in a second action practically the same evidence relied on to establish the case against the indemnitee in the first action, as well as the reasonableness of the settlement." *Id.* (citing Martinique Shoes Inc. v. New York Progressive Wood Heel Company, 217 A.2d 781 (Pa. Super. Ct. 1966)).

Next, GE argues that APU cannot seek indemnity for a loss that was caused in any part by APU's own negligence. Under New Jersey law "a contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms." *Mantilla v. NC Mall Associates*, 770 A.2d 1144, 1151 (N.J. 2001). Pennsylvania law is the same. *Ruzzi v. Butler Petroleum Co.*, 588 A.2d 1, 4 (Pa. 1991) ("if parties intend to include within the scope of their indemnity agreement a provision that covers losses due to the indemnitee's own negligence, they must do so in clear and unequivocal language. No inference from words of general import can establish such indemnification.").

GE points out that in this instance, the NJDOT and SEPTA Contracts specifically provide that GE was *not* covering losses caused by APU's own negligence. GE cites to the language providing that the "indemnification shall not apply to loss, injury or damage caused by the Railroad." (Doc. 95-1, at 60; Doc. 95-2, at 126.) GE then points to evidence in the record which indicates that APU contributed to the contamination of the Paoli Yard site. For example, GE cites to testimony that APU employees spread PCB oil at the Paoli Yard site to control dust.

APU questions this testimony, and cites evidence which it claims shows that any contamination which resulted from the employees spraying or dumping oil on the site was

minimal.  APU argues that the evidence instead shows that the contamination came directly from the transformers.  The Court concludes that there is a genuine issue of material fact on this issue.

Accordingly, the Court concludes that APU is not entitled to summary judgment on its contractual indemnification claims.

## IV.    <u>CONCLUSION</u>

Based on the foregoing, it is hereby **ORDERED** that Plaintiff American Premier Underwriters, Inc.'s Motion for Partial Summary Judgment on the Issue of Defendant's Indemnification Liability (Doc. 93) is **DENIED**.

**IT IS SO ORDERED.**

_/s/ Michael R. Barrett_
Michael R. Barrett, Judge
United States District Court