# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

American Premier Underwriters Inc.,

    Plaintiff,

    v.                                          Case No. 1:05cv437

General Electric Company,                Judge Michael R. Barrett

    Defendant.

## OPINION & ORDER

This matter is before the Court on Plaintiff American Premier Underwriters, Inc.'s ("APU") Motion for Partial Summary Judgment on the Issues of Defendant's Arranger and Operator Liability under CERCLA. (Doc. 94.) Defendant General Electric ("GE") has filed a Response in Opposition (Doc. 105), and APU filed a Reply (Doc. 144).[1]

## I. BACKGROUND

Plaintiff APU is the successor to the Penn Central Transportation Company ("Penn Central"). This action arises from contamination at four rail yards operated by Penn Central prior to April 1, 1976: (1) the Paoli Yard, located in Paoli, Pennsylvania; (2) the South Amboy Yard, located in South Amboy, New Jersey; (3) Sunnyside Yard, located in Long Island, New York; and (4) Wilmington Shops and related facilities, located in Wilmington, Delaware. During the period when Penn Central operated these rail yards, it owned and used passenger rail cars with transformers manufactured by GE. APU claims the GE transformers contaminated the rail yards by leaking polychlorinated biphenyls

---

[1] To the extent that the parties have addressed the issues regarding whether GE was an arranger and operator in the briefing of GE's Motion for Summary Judgment on the Merits (Doc. 92), the Court has considered those arguments in reaching its decision.

("PCBs"). The PCBs were contained in "Pyranol," which was the trade name of the fluid used by GE in the transformers as a cooling and insulating fluid.[2] The transformers leaked or "burped" Pyranol when the pressure relief devices or valves on the transformers opened to relieve excess pressure.[3] The transformers also leaked Pyranol around the welds and bushings in the transformers.

Following this Court's ruling on GE's Motion to Dismiss (Doc. 60) and GE's Motion for Summary Judgment on Statute of Limitations Issues (Doc. 151), APU's remaining claims are as follows: Count I – cost recovery and declaratory relief under CERCLA § 107(a) based on removal activity at the Sunnyside and Wilmington sites; Count III – contribution and declaratory judgment under CERCLA § 113(f) based on certain costs incurred at the Paoli site; Count IV – contractual indemnification relating to the Silverliner IV cars; Count V – contractual indemnification relating to the Jersey Arrow II cars; Count VII – contribution under the PHSCA based on certain costs incurred at the Paoli site; Count XI – trespass at the Wilmington site under Delaware law; Count XII – negligence at the Wilmington site under Delaware law; Count XIII – private nuisance at the Wilmington site under Delaware law; Count XIV – public nuisance at the Wilmington site under Delaware law; Count XV – abnormally dangerous activity at the Wilmington site under Delaware law; Count XVI – strict liability at the Wilmington site under Delaware law; Count XVII negligent

---

[2]The transformers were mounted beneath the cars and "served to 'step down' the 11,000 volt alternating current transmitted by overhead catenary wires along the rail lines to approximately a 600 volt direct current to power electric motors for rail car propulsion and the operation of lighting, air conditioning and other onboard electrical systems. This transformation of electrical power generates significant heat within the MU car transformer. PCBs served as an insulating fluid that internally cooled the transformer during use." (Doc. 99-1, at 34-35, William J. Hengemihle 11/12/2010 Report.)

[3]However, sometimes the valves only emitted gas, and did emit not Pyranol.

design at the Wilmington site under Delaware law; Count XVIII – negligent manufacture at the Wilmington site under Delaware law; Count XIX – failure to warn at the Wilmington site under Delaware law; Count XXII – punitive damages; and Count XXIII – assignment of SEPTA, Amtrak and Conrail's claims.

APU's Motion for Partial Summary Judgment is only directed toward the issue regarding whether GE is subject to arranger or operator liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving part has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id*. at 252.

## III. ANALYSIS

### A. CERCLA framework

The United States Supreme Court has explained that CERLA "was designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quoting Consolidated Edison Co. of N.Y. v. UGI Util., Inc., 423 F.3d 90, 94 (2d Cir. 2005)). Section 107(a) of CERCLA identifies four categories of potentially responsible parties ("PRPs") subject to strict liability: (1) the current owner or operator of a waste facility; (2) any previous owner or operator during any time in which hazardous substances were disposed at a waste facility; (3) any person who arranged for disposal or treatment of hazardous substances at the waste facility; and (4) any person who transported hazardous substances to a waste facility. *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347 n.8 (6th Cir. 1998) (citing 42 U.S.C. § 9607(a)(1)-(4)). PRPs are liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe" and for "any other necessary costs of response incurred by any other person." 42 U.S.C. § 9607(a)(4)(A)-(B).

Following this Court's ruling on GE's Motion for Summary Judgment on Statute of Limitations Issues, APU is limited to the recovery of costs under its CERCLA § 107(a) claim based on removal activity at the Sunnyside and Wilmington sites; and under its CERCLA § 113(f) claim based on certain costs incurred at the Paoli site.

## B. Arranger liability

Section 9607(a) identifies arranger liability as attaching to:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . .

42 U.S.C. § 9607(a)(3).

GE argues that is it not an arranger under CERCLA because the GE transformers, as well as the PCB-containing Pyranol fluid they incorporated, were useful products.

The Sixth Circuit has explained that the mere sale of a product is not "arranging for disposal" under the statute. *AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 999 (6th Cir. 1993) (citing Kelley v. ARCO Indus. Corp., 739 F.Supp. 354, 357-58 (W.D.Mich.1990)). Moreover, "no arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a 'useful, albeit dangerous product, to serve a particular, intended purpose.'" *Id.* "Liability only attaches to parties that have 'taken an affirmative act to dispose of a hazardous substance . . . as opposed to convey a useful substance for a useful purpose.'" *Id.* (quoting Prudential Ins. Co. v. U.S. Gypsum, 711 F.Supp. 1244, 1253 (D.N.J.1989)). In the absence of a contract or agreement, a court must look to the totality of the circumstances, including any "affirmative acts to dispose," to determine liability. *United States v. Cello–Foil Prod., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996).

In *Burlington N. & Santa Fe Ry. Co. v. United States*, the United States Supreme Court explained that liability under section 9607(a)(3) exists on a spectrum:

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. *See Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 164 (C.A.2 1999); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (C.A.11 1990). Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes—cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear. In such cases, courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a "disposal" or a "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions. *See Freeman*, 189 F.3d, at 164; *Pneumo Abex Corp. v. High Point, Thomasville & Denton R. Co.*, 142 F.3d 769, 775 (C.A.4 1998) (" '[T]here is no bright line between a sale and a disposal under CERCLA. A party's responsibility . . . must by necessity turn on a fact-specific inquiry into the nature of the transaction' " (quoting United States v. Petersen Sand & Gravel, 806 F.Supp. 1346, 1354 (N.D.Ill.1992))); *Florida Power & Light Co.*, 893 F.2d, at 1318.

556 U.S. 599, 609-610 (2009) (citations omitted).

The Supreme Court explained that even though the question of liability under Section 9607(a)(3) is fact intensive and fact specific, liability "may not extend beyond the limits of the statute itself. *Id.* at 610. The Court explained that the phrase "arrange" must be given its ordinary meaning, and "in common parlance, the word 'arrange' implies action directed to a specific purpose." *Id.* at 611 (citing Merriam–Webster's Collegiate Dictionary 64 (10th ed.1993) (defining "arrange" as "to make preparations for: plan[;] ... to bring about an agreement or understanding concerning")). Accordingly, the Court approved the Sixth Circuit's approach of defining arranger under Section 9607(a)(3) to include intentional steps to dispose of a hazardous substance. *Id.* (citing Cello–Foil Prods., Inc., 100 F.3d,

at 1231 ("[I]t would be error for us not to recognize the indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal . . . of hazardous substances'")).

In *Burlington*, the United States and two railroads filed claims under CERCLA against Shell Oil Company for contribution of clean up costs for a site contaminated with pesticides. Shell delivered pesticides in bulk to a business which leased the site from the railroads. Shell shipped the pesticides by common carrier, and in the process of transferring the pesticides, some of the pesticide would spill on the ground.

The Supreme Court rejected the argument of the Government that Shell arranged for the disposal of pesticides by shipping the pesticides under conditions it knew would result in the spilling of a portion of the hazardous substance by the purchaser or the common carrier. *Id.* at 612. The Supreme Court explained:

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product. In order to qualify as an arranger, Shell must have entered into the sale of [the pesticide] with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3). Here, the facts found by the District Court do not support such a conclusion.

*Id.* at 612.

This Court finds it difficult to distinguish *Burlington* from this case based on the legal guidelines provided by the Supreme Court. There is no dispute that the rail cars manufactured and designed by GE were useful products. Nor is there a dispute that the transformers were also useful. Furthermore, there is evidence in the record that Pyranol

was essential to the functioning of the transformer. (Doc. 134, James Kennedy Depo. (3/4/2011) at 31; Doc. 130, John Evans Depo. (1/28/2010) at 31-34.)

The Court finds that the "burping" of Pyranol or the leaking of Pyranol from welds or bushings fits within CERCLA's definition of "disposal," which includes "leaking" and "spilling." 42 U.S.C. 6903(3).[4] However, the evidence in the records shows that the "disposal" of PCBs occurred as "a peripheral result of the legitimate sale of an unused, useful product."

While GE intentionally designed the transformers to have certain elements–a pressurized tank, welds, bushings, gaskets, and seals–there is evidence that the optimal functioning of a GE transformer was to operate without any release of insulating fluid. (Doc. 134, James Kennedy Depo. (3/4/2011) at 162.) The release of Pyranol through the pressure relief valve was an "undesirable consequence." (Doc. 105-1, at 18.) GE did not incorporate the pressure relief devices with "a specific purpose" to discharge Pyranol into the environment. Instead, the pressure relief device was intended to relieve excess pressure in the tank which would prevent a catastrophic rupture of the tank. (Doc. 130, John Evans Depo. (1/28/2010) at 90; Doc. 135, Leonard Wharton Depo. at 141.)

APU argues that GE is subject to arranger liability because it knew the transformers were leaking PCBs and warned Penn Cental that it should prevent Pyranol from entering

---

[4]Under CERLCA, "disposal" is defined as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 9601(29) (referring to the definition of the same term in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3)).

into the environment. However, in this instance, knowledge alone is not enough. In *Burlington*, there is evidence that Shell was aware that minor, accidental spills occurred during the transfer of the pesticides. 556 U.S. at 612. The Supreme Court found that this:

> evidence does not support an inference that Shell intended such spills to occur. To the contrary, the evidence revealed that Shell took numerous steps to encourage its distributors to reduce the likelihood of such spills, providing them with detailed safety manuals, requiring them to maintain adequate storage facilities, and providing discounts for those that took safety precautions.

*Id.* at 613. Similarly, there is no inference that GE intended for the transformers to leak the PCBs contained in the Pyranol.

Based on the foregoing, the Court concludes that APU is not entitled to summary judgment on the issue of whether GE was subject to arranger liability under Section 9607(a)(3).

### C.  **Operator liabilty**

Section 9607(a) of CERCLA identifies operator liability as attaching to:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

42 U.S.C. § 9607(a)(1)-(2).

The United States Supreme Court has explained that the term "operator" is to be given its "ordinary or natural meaning." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998) (quoting Bailey v. United States, 516 U.S. 137, 145 (1995)). The Court explained further:

> In a mechanical sense, to "operate" ordinarily means "[t]o control the functioning of; run: operate a sewing machine." American Heritage Dictionary 1268 (3d ed. 1992); see also Webster's New International

> Dictionary 1707 (2d ed. 1958) ("to work; as, to operate a machine"). And in the organizational sense more obviously intended by CERCLA, the word ordinarily means "[t]o conduct the affairs of; manage: operate a business." American Heritage Dictionary, supra, at 1268; see also Webster's New International Dictionary, supra, at 1707 ("to manage"). So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66-67. Working from this definition, the Sixth Circuit has explained that to be held liable as a operator "one must perform affirmative acts. The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *United States v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998).

Under CERCLA, "facility" is defined as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). APU explains that the "facility" is in this case is "the transformer/railcar facilities and the railyard facilities." GE responds that the only "facilities" are the railyards. The Court finds the definition of "facility" is broad enough to cover both the railcars, as "rolling stock," and the railyards where the railcars were located when the PCBs were leaked. *Accord United States v. Twp. of Brighton*, 153 F.3d at 313 (defining "facility" broadly so that "an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility,' even if it contains parts that are non-contaminated.").

GE argues that "at the time of disposal of" the PCBs, the railcars were in normal operation and under the exclusive control of the railroad and railroad employees. (Doc. 130, John Evans Depo. (1/28/2010) at 241; Doc. 134, James Kennedy Depo. (3/4/2011) at 152, 166-67.) However, the Supreme Court has given a broad definition to "operate." *See Bestfoods,* 524 U.S. at 67 ("an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."). There is evidence in the record which shows that GE "manage[d], direct[ed], or conduct[ed]" operations to the extent that it was involved in the problems with the transformers which leaked Pyranol.

A GE document dated January 27, 1969 called attention to "a serious situation" regarding the transformers for "the Northeast Corridor project:"

> The problems that we have been having with these transformers are not new. The pyranol leaks in the welds and bushings have been present on every transformer application we have made. It may be a quality problem, however, the customer expects us to design a transformer that will not leak . . . In most of the cases the leaks are appearing approximately one year after manufacture. In general, the weld leaks show up when the unit is first engergized and leaks in the bushings usually show up after a relatively short amount of operating time.

(Doc. 99-1, at 101.) In addition, GE was aware that the railcars which were being operated by Southeastern Pennsylvania Transportation Authority ("SEPTA") and New Jersey Department of Transportation ("NJDOT") had problems with the windings inside the transformers. (Doc. 138-3, at 16.) These problems lead to "arcing" or an "arc failure." (Doc. 137, Lorne MacMonagle Depo. (12/7/2009) at 110.) In some instances, the failures lead to the rupture of the transformers. (Doc. 137, Lorne MacMonagle Depo. (12/7/2009)

at 110; see also Doc. 133, Kim Simpkins Depo. at 73, 75.) In other instances, the failure could lead to a pressure relief problem. (Doc. 137, Lorne MacMonagle Depo. (12/7/2009) at 110.)

According to a GE document dated April 2, 1975, GE made the decision to fix the SEPTA transformers after they failed, rather than retrofit the transformers with a new design:

> Based on review of field failure data, availability of a turn-around pool of transformers, and the cost associated to update 150 transformers, we believe that it will be less costly to General Electric Company not to retrofit the fleet as outlined . . .
>
> There are approximately 150 transformers to be updated per new clamping design. If the cost to accomplish is 5K to 6K, plus 2K for in and out, and transportation, and a complete failure costs 30K to 36K, we could have approximately 30 more failures and still be even from a dollar expended basis.

(Doc. 95-3, at 15.) The Court finds that this policy is a factor to be weighed in determining whether GE exercised actual control.[5]

---

[5]The Court finds the suggested factors included in Judge Moore's concurrence in *United States v. Twp. of Brighton* instructive:

> A court's analysis of whether a governmental entity exercised "actual control" over a facility's hazardous waste activities should consider the following factors: the government's expertise and knowledge of the environmental dangers posed by hazardous waste, establishment and design of the facility, participation in the opening and closing of a facility, hiring or supervising employees involved in activities related to pollution, determination of the facility's operational plan, monitoring of and control over hazardous waste disposal, and public declarations of responsibility over the facility and/or its hazardous waste disposal. *See United States v. Stringfellow*, 20 Envtl. L. Rep. 20656, 20658 (C.D.Cal. January 9, 1990) (citing Rockwell Int'l Corp. v. IU Int'l Corp., 702 F.Supp. 1384, 1390-91 (N.D.Ill.1988)). None of these factors alone is necessarily sufficient to render a governmental entity an operator of the facility in question; nor is this list exhaustive. District courts should weigh these factors, as well as any other factors indicative of actual control over a facility's hazardous waste operations, to determine whether the regulatory activities of a governmental entity went beyond mere regulation and

Another factor is that GE was required under the warranty agreement to address the transformer failures on the SEPTA cars. (Doc. 138, Lorne MacMonagle Depo. (3/12/2010) at 99; see also Doc. 100-1.) From 1975 to 1977, GE had employees on site at Paoli to address the transformer failures. (Doc. 132, Albert Keefe Depo. at 31.) These employees included a "Site Manager" and three other employees who worked out of a trailer on the site. (Doc. 132, Albert Keefe Depo. at 30.) These employees worked as warranty administrators. (Doc. 132, Albert Keefe Depo. at 29.) These employees "trained, [ ] assisted with troubleshooting, administrative functions of doing failure analysis, determining whether it was legitimate equipment failure, whether the equipment was abused." (Doc. 132, Albert Keefe Depo. at 32.) At times, the Site Manager "dispatched people to go out and ride the equipment to find out what the railroad was complaining about." (Id.) Part of the duties of the Site Manager included reporting "burping" of the transformers and handling problems associated with "burping." (Doc. 132, Albert Keefe Depo. at 56.)

In addition, railcars with failed transformers would regularly be sent to GE's Philadelphia Service Shop for repair. (Doc. 138, Lorne MacMonagle Depo.(3/12/2010) at 55-56.) Some railcars with failed transformers were sent to the GE manufacturing facility in Pittsfield, Massachusetts. (Doc. 132, Albert Keefe Depo. at 37.) The evaluation of transformers and determining what repairs were required was the primary responsibility of GE. (Doc. 138, Lorne MacMonagle Depo.(3/12/2010) at 38.) GE had in place a standard direction that any time a railcar came to the warranty administrators at Paoli with a failed

---

amounted to macromanagement of the facility in question.

153 F.3d at 327 (Moore, J., concurring).

transformer, the GE employees on site would contact the GE Service Shop and the GE manufacturing facility in Pittsfield to determine what steps to take. (Doc. 132, Albert Keefe Depo. at 36-37.) In some instances, railcars with failed transformers were sent to Pittsfield for further diagnosing. (Doc. 132, Albert Keefe Depo. at 37.)

GE argues that these activities do not show that they exercised direction or control over the railcars. GE explains that the railroad could have taken the GE-built transformers out of service. The Court finds that this argument goes toward divisibility and is not dispositive of the issue of operator liability. See *United States v. Twp. of Brighton*, 153 F.3d at 317. ("If an entity is an operator, it is jointly and severally liable for any hazardous material that is found, whatever its source, unless that operator can show divisibility.").

However, the Court does find some merit in GE's argument that the majority of evidence presented by APU pertains to the Paoli Yard.[6] The Court also notes that the problems with the transformers only came to warranty administrators at Paoli after the railroad employees could not resolve the problems. (Doc. 132, Albert Keefe Depo. at 33 ("Any type of problems that they couldn't resolve were left there for us to come in in the morning and help them diagnose the problem.")). In addition, there were times when there was a problem with a transformer, and instead of allowing the GE employees diagnose the problem, "the railroad made that decision themselves during the night, and if [the transformer] did not exhibit black oil they put it back out for service the next morning without us making any determination." (Doc. 132, Albert Keefe Depo. at 56.) Therefore,

---

[6]The Court notes that there is some indication that GE had employees working as warranty administrators at the Sunnyside and Wilmington sites. (Doc. 132, Albert Keefe Depo. at 43.)

Court concludes that there are genuine issues of material fact as to whether GE exercised sufficient control over the Sunnyside and Wilmington sites, as well as the Paoli site.

Based on the foregoing, the Court concludes that APU is not entitled to summary judgment on the issue of whether GE was subject to operator liability under Section 9607(a).

## IV. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Plaintiff American Premier Underwriters, Inc.'s Motion for Partial Summary Judgment on the issues of Defendant's Arranger and Operator Liability under CERCLA (Doc. 94) is **DENIED**.

**IT IS SO ORDERED.**

                                        */s/ Michael R. Barrett*
                                        Michael R. Barrett, Judge
                                        United States District Court