**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

American Premier Underwriters, Inc.,

        Plaintiff,                            Case No.  1:05cv437

        v.                                Judge Michael R. Barrett

General Electric Company,

        Defendant.

## OPINON & ORDER

This matter is before the Court upon Plaintiff American Premier Underwriters' Motion to Reconsider the Court's Rulings on Defendant's Arranger Liability under CERCLA.  (Doc. 159).  Defendant General Electric Company has filed a Response (Doc. 160) and Plaintiff has filed a Reply (Doc. 164).

## I.      BACKGROUND

Plaintiff American Premier Underwriters, Inc. ("APU") is the successor to the Penn Central Transportation Company ("Penn Central").  This action arises from contamination at four rail yards operated by Penn Central.  During the period when Penn Central operated these rail yards, it owned and used passenger rail cars with transformers manufactured by GE.  APU claims the GE transformers contaminated the rail yards by leaking polychlorinated biphenyls ("PCBs").  The PCBs were contained in "Pyranol," which was the trade name of the fluid used by GE in the transformers as a cooling and insulating fluid.  The transformers leaked or "burped" Pyranol when the pressure relief devices on the transformers opened to relieve excess pressure.  The transformers also leaked Pyranol around the welds and bushings in the transformers.

While APU attempted to introduce a number of exhibits which were not a part of the record when the Court ruled on GE's arranger liability (see Doc. 166), these exhibits do not alter these basic, uncontested facts.

In ruling on APU's Motion for Partial Summary Judgment and GE's Motion for Summary Judgment, this Court held that GE is not subject to arranger liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675.  (Docs. 154, 155).  APU argues that after this Court ruled, other courts have rejected this Court's narrow application of the scope of arranger liability.  APU seeks reconsideration of this Court's determination that APU is entitled to judgment as a matter of law on the issue of whether GE is an arranger under CERCLA.

## II.    ANALYSIS

### A.  Standard of Review

Although a motion for reconsideration is not mentioned in the Federal Rules of Civil Procedure, it is often treated as a motion to amend judgment under Rule 59(e). *McDowell v. Dynamics Corp. of America*, 931 F.2d 380 (6th Cir. 1991).  There are three grounds for amending a judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; and (3) to correct a clear error of law or to prevent manifest injustice.  *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (citations omitted); *Gascho v. Global Fitness Holdings, LLC*, 918 F. Supp. 2d 708, 714 (S.D. Ohio 2013).  However, a motion under Rule 59(e) is not an opportunity to reargue a case.  *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (citation omitted).

## B.  Arranger liability under CERCLA

Section 9607(a) of CERCLA states arranger liability attaches to:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . .

42 U.S.C. § 9607(a)(3).  Under CERCLA, "disposal" is defined as:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 9601(29) (referring to the definition of the same term in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3)).

In *Burlington N. & Santa Fe Ry. Co. v. United States*, the Supreme Court explained that the phrase "arrange" must be given its ordinary meaning, and "[i]n common parlance, the word 'arrange' implies action directed to a specific purpose."  556 U.S. 599, 611 (2009) (citing Merriam–Webster's Collegiate Dictionary 64 (10th ed.1993) (defining "arrange" as "to make preparations for: plan[;] . . . to bring about an agreement or understanding concerning")).  The Court explained: "Consequently, under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  *Id.*  The Court explained that liability under section 9607(a)(3) exists on a spectrum:

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance.  It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of

3

> that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination.  Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes—cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear.

*Id.* at 609-610 (citation omitted).  The Court explained that for these cases in the middle of the spectrum, there must be a "fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale.'"  *Id.*

The facts of *Burlington* are as follows.  The Shell Oil Company sold pesticides to an agricultural chemical distributor, B&B.  *Id.* at 602-603.  Originally, the pesticides were sold in drums and containers.  *Id.* at 603.  Later, Shell required distributors to maintain bulk storage facilities.  *Id.*  The pesticides were delivered to B&B by common carrier.  *Id.*  There were often leaks and spills when the pesticide was transferred from tanker trucks to a bulk storage tank on B&B's site, or when B&B transferred the pesticide out of the tank.  *Id.*  Shell was aware that spills occurred and took steps to encourage the safe handling of its products, including providing safety manuals to its distributors, offering discounts for implementing safe practices, and requiring inspections to determine compliance with the applicable laws and regulations.  *Id.* at 604.  Despite these efforts, B&B remained a "sloppy operator" and caused contamination of the soil and groundwater.  *Id.* at 605.

The Supreme Court viewed Shell's knowledge that pesticides were leaked as one factor to consider when determining the specific purpose of the sales transaction:

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the

4

legitimate sale of an unused, useful product.  In order to qualify as an arranger, Shell must have entered into the sale of [the pesticide] with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3).

*Id.* at 612.  The Court found that the evidence did not support an inference that Shell intended the spills to occur.  *Id.* at 612-13.  Instead, there was evidence that Shell took numerous steps to encourage its distributors to avoid the spills.  *Id.* at 613.  Even though these measures were "less than wholly successful," the Court held that Shell's "mere knowledge that spills and leaks continued to occur" did not subject to Shell arranger liability under CERCLA.

In light of *Burlington*, this Court found GE was not subject to arranger liability. (Doc. 154, at PAGEID # 25459).  This Court noted that the transformers were useful products and there was evidence that the Pyranol was essential to their function.  (Id. at PAGEID # 25458).  This Court found that the "burping" of Pyranol or the leaking of Pyranol from welds or bushings fits within CERCLA's definition of "disposal," which includes "leaking" and "spilling."  (Id.)  However, this Court noted that there was evidence that the "disposal" of PCBs occurred as "a peripheral result of the legitimate sale of an unused, useful product."  (Id.)  Specifically, this Court noted:

While GE intentionally designed the transformers to have certain elements–a pressurized tank, welds, bushings, gaskets, and seals–there is evidence that the optimal functioning of a GE transformer was to operate without any release of insulating fluid. (Doc. 134, James Kennedy Depo. (3/4/2011) at 162.)  The release of Pyranol through the pressure relief valve was an "undesirable consequence." (Doc. 105-1, at 18.)  GE did not incorporate the pressure relief devices with "a specific purpose" to discharge Pyranol into the environment.  Instead, the pressure relief device was intended to relieve excess pressure in the tank which would prevent a catastrophic rupture of the tank. (Doc. 130, John Evans Depo. (1/28/2010) at 90; Doc. 135, Leonard Wharton Depo. at 141.)

(Id.)  This Court held that while GE knew that the transformers were leaking PCBs, knowledge alone was not enough because there was no inference that GE intended for the transformers to leak Pyranol.  (Id.)

The Court finds support for this conclusion in a case which was decided before this Court's decisions regarding arranger liability, but was not cited by the Court in its opinions.  (See Docs. 154, 155).  In *Team Enterprises., LLC v. Western Investment Real Estate Trust*, the Ninth Circuit found that the manufacturer of dry cleaning machine equipment was not subject to arranger liability.  647 F.3d 901, 909 (9th Cir. 2011).  The equipment was designed to filter and recycle wastewater which contained PCE, a hazardous substance.  *Id*. at 906.  The equipment returned distilled PCE to the dry cleaning machines for reuse and deposited the resulting wastewater into an open bucket.  *Id*.  The wastewater, which contained dissolved and invisible amounts of PCE, was poured down the sewer drain.  *Id*.

The Ninth Circuit took special note of the Supreme Court's admonition in *Burlington* that "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product."  *Id*. at 908 (quoting 556 U.S. at 612).  The court explained that:

> The useful product doctrine serves as a convenient proxy for the intent element because of the general presumption that persons selling useful products do so for legitimate business purposes.  It would be odd, for example, to say that an auto parts store sells motor oil to car owners for the purpose of disposing of hazardous waste.  Conversely, persons selling or otherwise arranging for the transfer of hazardous waste (which no longer serves any useful purpose) are more likely trying to avoid incurring liability that might attach were they to dispose of the hazardous waste themselves.  In other words, the probable purpose for entering into such a transaction is to dispose of hazardous waste.

6

*Id.* The court noted that even though the dry cleaning equipment itself was not a hazardous substance, the useful product doctrine was applicable. *Id.* at 909. The court explained that "[a]bsent a showing that [the manufacturer] intended for its sale of the [equipment] to result in the disposal of PCE, we must conclude that [the manufacturer] lacks the requisite intent for arranger liability." *Id.* (citing *Burlington*, 556 U.S. at 611 ("'[I]t would be error for us not to recognize the indispensable role that state of mind must play in determining whether a party has otherwise arranged for disposal . . . of hazardous substances.'") (quoting *United States v. Cello–Foil Prods., Inc.*, 100 F.3d 1227, 1231 (6th Cir. 1996)).

In analyzing whether the manufacturer had the requisite intent, the Ninth Circuit rejected the argument that intent could be inferred from the manufacturer's design, which rendered the disposal of the wastewater down the drain inevitable. *Id.* at 909. The court explained that the design of the machine did not indicate that the manufacturer "*intended* the disposal of PCE." *Id.* (emphasis in original). Instead, the design indicates that the manufacturer was at most, "indifferent to the possibility" that the user would pour PCE down the drain. *Id.* The court explained "that to satisfy the intent requirement, a company selling a product that uses and/or generates a hazardous substance as part of its operation may not be held liable as an arranger under CERCLA unless the plaintiff proves that the company entered into the relevant transaction with *the specific purpose* of disposing of a hazardous substance." *Id.* (emphasis in original). *Accord City of Merced Redevelopment Agency v. Exxon Mobil Corp.*, No. 1:08-CV-714-LJO-GSA, 2015 WL 471672, at *26 (E.D. Cal. Feb. 4, 2015)

(plaintiff cannot dispute that "purpose of Defendants' legitimate sales of their MTBE-containing gasoline was to sell gasoline, not to dispose of MTBE.").

Even though GE designed the transformers so that the pressure relief devices burped or leaked Pyranol, this evidence does not demonstrate that GE manufactured and sold the transformers with the specific purpose of disposing of a hazardous substance.  None of the cases cited by APU in its Motion for Reconsideration change this Court's conclusion that GE lacks the requisite intent for arranger liability to attach.

APU calls this Court's attention to *U.S. v. GE*, 670 F.3d 377 (1st Cir. 2012), in which the First Circuit found that GE was subject to arranger liability under CERCLA for its sale of "scrap Pyranol." *Id*. at 380.  GE sold the scrap Pyranol to a paint manufacturing businessman, Fletcher, who used it as an additive in his paints. *Id*.  The First Circuit contrasted GE's sale of Pyranol to Shell's sale of the pesticides in *Burlington*. *Id*. at 385.  The court explained that instead of being "a legitimate new and useful product, the record here contains ample evidence that GE viewed scrap Pyranol as waste material and that any profit it derived from selling scrap Pyranol to Fletcher was subordinate and incidental to the immediate benefit of being rid of an overstock of unusable chemicals." *Id*.  For that reason, this Court finds the First Circuit's decision inapplicable here.  There is no dispute that when GE sold the transformers containing the Pyranol to the railroad, they were new and useful products.

Next, APU cites *Duke Energy v. Alcan Aluminum Corporation*, No. 5:08-CV-460-FL, 2013 WL 1881310, at *2 (E.D.N.C. May 6, 2013), in which the district court found that the defendant Broad River was subject to arranger liability based on its sending transformers containing hazardous materials for repair. *Id*.  The court found that repair

transactions "can create arranger liability, and are not analogous to sales transactions because ownership is critical" in determining intent.  *Id.*  The court noted that "Broad River owns the alleged hazardous substance (in its transformer oil) and owns the products being modified (used transformers) through the entire repair process."  *Id.*  The Court noted that in addition to the ownership of the transformers, there was evidence that Broad River retained the power to direct the specific handling of its transformers while under repair.  *Id.*  APU argues that like Broad River, GE took "intentional steps" to dispose of Pyranol, by exercising significant control over the transformer in its design and manufacture, along with managing and controlling the maintenance and repairs to the transformers.  However, APU is missing the element that was "critical" in *Duke Energy*: after the rail cars were sold, GE did not own the transformers.  Therefore, this Court finds *Duke Energy* inapplicable.

To further support its argument that GE is subject to arranger liability, APU cites to two cases which involve the sale of "broke," which is scrap created during the process of making or coating paper.

In *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920, at *1 (E.D. Wis. July 3, 2012), the district court explained that recycling mills could take broke, recover the paper fibers from it and turn that fiber into new paper. However, this recycling process also resulted in the discharge of PCBs into a nearby river.  *Id.*  The court concluded that the evidence showed that the employees of the company which produced the paper would have known that at least some portion of the broke waste product would end up in the river.  *Id.* at *7.  However, the court explained that this knowledge was not enough for arranger liability to attach:

> At best, however, that knowledge would have been in the nature of an afterthought—much like the manufacturer in *Team Enterprises*. The *Team Enterprise* case stands for the principle, already established in *Burlington Northern*, that knowledge alone is not a substitute for intent. Although some employees might have understood the process from beginning to end, there was no evidence that it was part of their job duties to consider such things. Nor was there any evidence that they actually did consider such things.

*Id.* at \*8. The court also distinguished the broke sold by the paper company from the scrap Pyranol sold by GE in *United States v. General Electric* because the evidence in the record showed that the broke had more characteristics of a useful product than of a waste product *Id.* at \*12. The court concluded that the paper company was not an arranger under CERCLA. *Id.*

In the second "broke" case, in contrast, the court found that the paper company was an arranger because there was evidence that the company "understood, at various points in the production period, that the CCP broke they were selling to brokers and recycling mills generated a hazardous PCB waste as part of the normal recycling process." *Georgia-Pac. Consumer Products LP v. NCR Corp.*, 980 F. Supp. 2d 821, 832 (W.D. Mich. 2013). The district court concluded that

> NCR's continued attempts to move CCP broke near the end of the production period were not attempts to sell a genuinely useful product, but rather attempts to divest itself of a product that it knew to be hazardous and a legal liability. The fact that brokers and paper recyclers were, at the time, willing to pay for CCP broke is not evidence to the contrary, since NCR had deliberately attempted to conceal from them—and everyone else—the toxic nature of CCP broke. To the recyclers and brokers, CCP broke remained a safe, viable source of pulp. But, as the Court has found, NCR was fully aware of the truth no later than March of 1969. Because NCR knew by that time that CCP broke was a legal liability, not a useful product, its continued sale of CCP broke for years after that time is not covered by any "useful product" exemption to arranger liability. Rather, the Court concludes as a matter of law that NCR arranged for the disposal of CCP broke as a means of getting rid of a substance it knew to be hazardous.

10

*Id.* at 834-35.

GE does not dispute that it continued to sell transformers filled with Pyranol after discovering that Pyranol was an environmental contaminant.  However, while the Pyranol was contained in the transformers, Pyranol was not considered "waste." Instead, like the pesticides sold by Shell in *Burlington*, Pyranol was a useful—albeit hazardous—product.  Even though GE knew that Pyranol was leaking from the transformers, "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Burlington,* 556 U.S. at 612.

Next, APU relies on *Ecological Rights Foundation v. Pacific Gas and Electric Company*, 713 F.3d 502, 515 (9th Cir. 2013), where the Ninth Circuit addressed the issue of whether a wood preservative seeping from utility poles violated the Resource Conservation and Recovery Act ("RCRA").  The RCRA shares the same statutory definition of "disposal" as CERCLA.  However, APU focuses on the Ninth Circuit's discussion of whether the wood preservative was a "solid waste" under the RCRA. The court explained that the "PCP-based wood preservative that is released into the environment as a natural, expected consequence of its intended use—as a preservative for wooden utility poles—is not automatically "solid waste" under RCRA's definition of that term."  *Id.* at 518.  The court explained that it used the word "automatically" because it was not deciding "whether or under what circumstances PCP, wood preservative, or another material becomes a RCRA 'solid waste' when it accumulates in the environment as a natural, expected consequence of the material's intended use." *Id.*  APU cites this case to argue that once the Pyranol is discharged from the

11

transformer, the Pyranol becomes waste.  However, the Court finds it unnecessary to apply the Ninth Circuit's decision because there has already been a determination by this Court that the "burping" or leaking of Pyranol fits within CERCLA's definition of "disposal."  (Doc. 154).

APU also relies on *Coppola v. Smith*, 935 F. Supp. 2d 993 (E.D. Calif. 2013). However, the Court finds that this case is not applicable.  The district court in *Coppola* found that the "useful product defense" did not apply because what was at issue was the spread of waste water containing PCE from a well, not the delivery of water to consumers.  *Id.* at 1024.

Finally, APU cites to *W.R. Grace & Co. v. Zotos International, Inc.*, No. 98-CV-838S, 2013 WL 5488939, at *33 (W.D.N.Y. Sept. 30, 2013), where the district court imposed arranger liability on the manufacturer of hair care products, Zotos.  However, liability was not premised upon the original distribution the products.  Instead, the issue was whether the manufacturer was liable for the disposal of (1) unsold merchandise which was returned by customers to the manufacturer and (2) inventory that became outdated or obsolete.  *Id.* at *15.  The court explained:

> unlike the clearcut *Burlington Northern* example above, the disposal of unsold or unwanted products was not carried out unbeknownst to Zotos by distributors or end-users.  Rather, Zotos agreed to buy back products that were damaged in shipping, or that performed unsatisfactorily, or that distributors were unable to sell.  Zotos required its distributors to first request an authorization to return products and then required that they ship authorized returns to the Waterloo Plant for inspection and processing.  Through its return policies, Zotos intended to extract the maximum value from those unwanted products and minimize their waste by salvaging returned items for resale where possible.  It knew, however, that at least some portion of the material would remain unsalvageable waste.  In sum, Zotos did not merely put its products into the stream of commerce, an act that by itself is not sufficient to impose arranger liability. *See Solvent Chemical*, 218 F.Supp.2d at 337 (W.D.N.Y.2002) (citations

omitted). Rather, its transactions with distributors included an arrangement for the return and, if necessary, the disposal, of unwanted or unuseable products.

*Id.* at *30.  Likewise, the court found that Zotos was liable as an arranger for disposal of the obsolete products in its inventory because these products were never sold in the first instance.  *Id.* at *32.  This Court finds this case inapplicable because first, GE sold the transformers containing Pyranol, and second, at the time GE sold the transformers, they were useful products.

### C.  GE's Motion for Summary Judgment

APU argues that even if APU is not entitled to judgment as a matter of law on GE's arranger liability, that in and of itself does not mean as a matter of law that GE has no arranger liability.  According to APU, the Court should not have granted GE's motion for summary judgment on the issue of arranger liability in GE's favor.  APU argues the Court was required to construe the inferences from the factual record in favor of APU, as the non-moving party.

The Court does not disagree that it was required to "reverse" the inferences when it decided GE's motion for summary judgment on the issue of arranger liability.  However, the Court's determination that GE was not subject to arranger liability was based upon undisputed facts.  (See Doc. 142).

Based on the foregoing, Plaintiff American Premier Underwriters' Motion to Reconsider the Court's Rulings on Defendant's Arranger Liability under CERCLA (Doc. 159) is **DENIED**.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT