**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

American Premier
Underwriters, Inc.,

      Plaintiff,

           Case No. 1:05-cv-437
    v.

           Judge Michael H. Watson
General Electric
Company,

      Defendant.

## OPINION AND ORDER

This cause comes before the Court on Plaintiff American Premier

Underwriters, Inc.'s ("APU") Trial Brief, ECF No. 178, Defendant General Electric

Company's ("GE") Trial Brief, ECF No. 180, and APU's Reply, ECF No. 181.  For

the following reasons, the Court finds that GE is not liable as a former operator of

the Silverliner IV and Jersey Arrow II railcars or the Paoli, Sunnyside, and

Wilmington rail yards.

## I.    INTRODUCTION

APU is the successor to the Penn Central Transportation Company ("Penn

Central").[1]  Compl. ¶ 23, ECF No. 1.  This action arises from contamination at

three rail yards operated by Penn Central prior to April 1, 1976: (1) the Paoli Yard

in Paoli, Pennsylvania; (2) the Sunnyside Yard in Long Island, New York; and (3)

---

[1] The Court refers to Pennsylvania Railroad and Penn Central Transportation Company
collectively as "Penn Central."  The former was renamed to the latter after a 1968 merger.

the Wilmington Yard and its related facilities in Wilmington, Delaware. *Id.* at ¶ 24.
When Penn Central operated these three rail yards (collectively the "Yards"), it
owned and used passenger railcars with transformers designed and
manufactured by GE. *Id.* at ¶ 25.  APU claims these GE railcar transformers
contributed to contaminating the Yards by leaking polychlorinated biphenyls
("PCBs").  *Id.* at ¶ 2.  APU now seeks to hold GE responsible for portions of the
clean-up and response costs associated with those leaks based on its theory that
GE is a "former operator" of the Yards and related railcars, as that term is defined
by the Comprehensive Environmental Response, Compensation, and Liability
Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq*.  *Id.* at ¶ 1.  To understand
this litigation, a brief summary of its previous proceedings is necessary.

In 1992, the United States filed a CERCLA action against Penn Central to
recover response costs related to the contamination at the Paoli Yard.  *Id.* at
¶ 63. That case proceeded alongside other CERCLA claims against Penn
Central filed by the Southeastern Pennsylvania Transportation Authority
("SEPTA"), National Railroad Passenger Corporation ("Amtrak"), and
Consolidated Rail Corporation ("Conrail") to recover environmental costs incurred
at the Sunnyside and Wilmington Yards.  On September 20, 1999, SEPTA,
Amtrak, and Conrail entered into a settlement agreement with the United States
relating to the Paoli Yard; the settling defendants were obligated to pay $500,000
to the United States and $100,000 to Pennsylvania for response costs, and
$850,000 to the United States and Pennsylvania for natural resource damages

arising from the contamination at the Paoli Yard. APU SOF No. 22–23, ECF No. 96-2. About five years later, on November 8, 2004, APU, SEPTA, Amtrak, and Conrail entered into a settlement agreement relating to the contamination of the Paoli Yard, under which APU paid $23,000,000 to SEPTA and $15,000,000 to Amtrak.[2] *Id.* No. 27, ECF No. 96-3. Ten months after that, in September 2005, APU and the United States entered a settlement agreement under which APU paid another $6.4 million for response costs and natural resource damages related to the Paoli Yard. *Id.* No. 31–32. APU has also incurred costs related to CERCLA claims for the Sunnyside and Wilmington Yards. *Id.* Nos. 51, 56–58.

In June 2005, APU filed this action against GE asserting twenty-three causes of action under federal law and the laws of four states seeking to recover costs expended to remove the PCB contamination at the Yards. After GE moved to dismiss certain causes of action, the Court dismissed twelve of APU's claims. *See* Opinion & Order, ECF No. 60. Then, in May 2011, after discovery had closed, APU and GE each moved for summary judgment on various remaining claims. The case was then reassigned to Judge Barrett, who ruled on those motions. ECF Nos. 151, 153–55. Judge Barrett subsequently permitted the parties to move for reconsideration. *See* ECF No. 157. He later denied APU's Motion for Reconsideration. ECF No. 170. This case was then reassigned to the

---

[2] The United States had initially demanded $58,600,000. *Id.* No. 29.

Undersigned, who granted in part and denied in part GE's Motion for Reconsideration. ECF No. 175.

As a result of this extensive litigation history, only two claims remain for trial: (1) APU's recovery claim for removal costs at the Sunnyside and Wilmington Yards (Count I), and (2) APU's contribution claim for settlement payment to the United States in connection with the Paoli Yard (Count III). Although CERCLA's removal and contribution claims are separate, *United States v. Atl. Research Corp.*, 551 U.S. 128, 131 (2007), the parties agree that the threshold issue for both these remaining claims is whether GE qualifies as a former "operator" of the relevant facilities. *See* Joint Mot. to Approve Case Mgmt. Order at 1–2, ECF No. 176. Thus, that is the sole question before the Court, which the parties agreed to submit to the Court by trial briefs. *See* ECF Nos. 176–77. Based on those briefs and the evidence presented in them, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

For most of the twentieth century, Penn Central provided passenger and freight rail services throughout the United States. Compl. ¶ 16, ECF No. 1. Beginning in 1915, Penn Central operated self-propelled multi-unit ("MU") passenger railcars powered by electricity at the Paoli Yard in Paoli, Pennsylvania. APU Brief, Ex. 2 at 2, ECF No. 99-1. In 1928, Penn Central began commuter services from Philadelphia to the Wilmington Yard in

Wilmington, Delaware. *Id.* at 3. Then, in 1933, Penn Central first operated electric railcars at the Sunnyside Yard in Queens, New York. *Id.* at 4.

At those operations, Penn Central provided commuter services via MU railcars. Evans Dep. 13–15, ECF No. 180-1. The commuter cars were self-propelled using electricity provided by catenary lines strung above the railroads. *Id.* at 14–16. The railcars drew high-voltage alternating currents from the overhead lines, reduced the current to a lower voltage with an onboard electrical transformer, and converted the alternating current to a direct current with other electrical devices. *Id.* at 16–18. Each transformer was essentially a tank with various attachments coming out of it. Evans Dep. 31, ECF No. 180-1. To insulate the substantial heat within the tanks, the transformers were filled with a fluid called askarel, which contained PCBs. *Id.* at 26, 33. GE eventually trademarked its version of askarel as "Pyranol." *Id.* at 27.

Depending on the model of the railcar and its transformer, the volume of Pyranol in a transformer's sealed tank ranged from 80 to 140 gallons. *Id.* at 31–32. The transformers could not function with an insufficient amount of Pyranol since the internal components would then overheat, which would cause the tank to explode. *Id.* at 31, 33–34. Thus, when GE delivered the railcars to Penn Central, GE had already filled the transformer tanks with Pyranol. GE Ex. 5 ("MacMonagle Dep. II") at 203, Doc. 180-5. GE mounted the transformers under the railcars' cabins, about eight inches to two feet above the railroad (depending

on the railcar model). Ex. 101, ECF No. 102-2; Evans Dep. at 20–21, ECF No. 180-1.

As the internal components in a transformer became hot during operation, the Pyranol expanded, thereby increasing the tank's internal pressure. Evans Dep. at 34–35, ECF No. 180-1. GE designed the tank to accommodate increased pressure, and avoid a potential explosion, by including a pressure relief valve on the transformers. *Id.* at 35–37. These devices prevented tank ruptures by releasing vapor—and sometimes Pyranol—until the tank's internal pressure fell to a level that could not potentially rupture the tank. Evans Dep. at 65–74, ECF No. 180-1.

Beginning on July 1, 1965, and continuing until April 1, 1976, Penn Central and the New Jersey Department of Transportation ("NJDOT") entered agreements, which obligated Penn Central to run and maintain various railcars in New Jersey, including Jersey Arrow II railcars. APU SOF No. 6, ECF No. 95-2. On October 11, 1971, SEPTA leased Penn Central 130 Silverliner IV railcars for use in four Pennsylvania counties and in the City of Philadelphia. *Id.* Nos. 1, 4, ECF No. 95–1. On October 14, 1971, GE and NJDOT entered a sales contract under which GE agreed to "design, construct, test, deliver, and guarantee" 70 Jersey Arrow II railcars. *Id.* No. 7, ECF No. 95–2. A few days later, on October 18, 1971, SEPTA and GE executed a contract under which GE agreed to "design, construct, test, deliver, and guarantee" 144 Silverliner IV railcars for SEPTA. *Id.* No. 5, ECF No. 95–1. GE manufactured the Silverliner IV and

Jersey Arrow II railcars at its plant in Erie, Pennsylvania. MacMonagle Dep. II at 178, ECF No. 180-5. And GE manufactured those Railcars' transformers at a GE plant in Pittsfield, Massachusetts. *Id.* at 165. In addition to the Railcars' purchase agreements, GE executed warranty agreements with NJDOT and SEPTA.

In the warranty agreements, GE guaranteed that each Silverliner IV and Jersey Arrow II railcar and its components would contain no "defects in design, materials, and workmanship[.]" GE Ex. 14 at 12, ECF No. 180-14; GE Ex. 15 at 13, ECF No. 180-15. If 25% of the railcars experienced a particular component failure, GE was required to recall and repair that component in all the railcars. GE Ex. 16 at 1–2, ECF No. 180-16. But GE was not required to perform any repairs. GE Ex. 14 at 13–14, ECF No. 180-14; GE Ex. 15 at 13–14, ECF No. 180-15. Rather, GE had to pay for them. GE Ex. 14 at 13–14, ECF No. 180-14; GE Ex. 15 at 13–14, ECF No. 180-15. This reimbursement warranty policy included any costs Penn Central incurred for labor, fringe benefits, and overhead. GE Ex. 16 at 1, ECF No. 180-16.

Around June 1974, GE began delivering the Silverliner IV and Jersey Arrow II railcars to Penn Central on a rolling basis. GE Brief Ex. 2 ("Kennedy Dep.") at 97, ECF No. 180-2. Almost immediately, some railcar transformers suffered serious internal failures, GE Brief Ex. 17, ECF No. 180-17, that were sometimes accompanied by the release of Pyranol. GE Brief 26, ECF No. 180. GE investigated the issue and ultimately concluded that the failures were caused

by "a randomly occurring core blocking workmanship problem."[3] GE Brief Ex. 17 at 1, ECF No. 180-17. GE also concluded that the overall failure rate on the Railcars with the original design was between 10–20%. GE Brief Ex. 18, ECF No. 180-18. To remedy the issue, GE designed a modified coil blocking component that stabilized the tanks' coils and prevented short-circuiting. MacMonagle Dep. II at 197, ECF No. 180-5. This tweak solved the issue. Evans Dep. at 117–18, ECF No. 180-1. But GE only added that component to Railcars' transformers after they had already malfunctioned. GE Brief Ex. 17, ECF No. 180-17.

After GE delivered the Silverliner IV railcars to Penn Central, GE established a trailer at the Paoli Yard to house four GE employees that performed warranty administration and field service support to the Penn Central employees at the shop. Keefe Dep. at 29–31, ECF No. 180-3. To that end, when a railcar arrived at the Paoli Yard with a "warranty problem," a Penn Central shop foreman would enter the GE trailer and ask one of the four GE technicians for assistance. Evans Dep. at 163, ECF No. 180-1. Only the Penn Central shop foreman could request assistance from GE technicians. *Id.* Upon doing so, GE technicians assisted Penn Central employees with troubleshooting the railcar's problems, but those technicians were not allowed to give orders to

---

[3] GE, perhaps to put this in terms the Court better understands, describes the problem as "affect[ing] the stability of the components within the transformer tank." GE Brief 24, ECF No. 180.

the railroad employees since the GE technicians could only offer technical support. *Id.* So, according to the "ground rules," the Penn Central shop foreman was in charge, and only he could give commands regarding the maintenance and repair of the Railcars and their components. *Id.* For that reason, the GE technicians never tried to give orders to Penn Central employees but rather just offered them advice. *Id.* This hierarchy is consistent with Penn Central's labor organization at the Paoli Yard, which prohibited any non-Penn Central personnel from performing mechanical labor on the Railcars. Evans Dep. at 165–167, ECF No. 180-1. Thus, GE technicians were barred from performing any work on the Railcars, such as disconnecting wires, removing covers, or "that type of thing." *Id.* For that reason, the four GE technicians at the Paoli Yard never serviced or repaired any transformers there. Evans Dep. at 229–33, ECF No. 180-1.

The Railcars' transformers, which were filled with liquid, required repairs every now and then; but their tanks contained up to 140 gallons of Pyranol, so they were extremely heavy. APU SOF Ex. 98, ECF No. 102-2; MacMonagle Dep. I 147, ECF No. 180-4. To remove and then repair or replace the transformers, Penn Central employees sometimes drained the transformer tanks of Pyranol directly onto the railbeds or on other parts of the Yards. Keefe Dep. at 163–65, ECF No. 180-3; D'Antonio Dep. at 31–41, ECF No. 180-11.

In sum, APU asserts that Pyranol leaks occurred when: "(1) the Railcars' transformers overheated; (2) rocks or debris damaged the transformers while the Railcars were in service on the main line; (3) fluid volatilized; and (4) the Railcar's

transformers were serviced." APU's SOF No. 12, ECF No. 95-3. And the record indicates that some leaks occurred at the Paoli and Wilmington Yards from the deliberate wholesale dumping or spraying of fluids drained from the rail car transformers and from unintended spillage and leakage of fluids from transformers. *Id.*

### III. LAW AND ANALYSIS

The threshold issue here is whether GE is a former operator of the Yards or Railcars. CERCLA defines a former "operator" as anyone "who at the time of disposal of any hazardous substance . . . operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a)(2). APU and GE agree that some of those elements are supported by the evidence here. First, there is no dispute that the Railcars and Yards qualify as separate "facilities" under CERCLA. And both parties agree that Pyranol, which contains PCBs and is a "hazardous substance" under CERCLA, was released at the Yards and from the transformers of some Railcars. The only disagreement between APU and GE, then, is whether GE *operated* the Yards or Railcars *when* the Pyranol leaks occurred.

The temporal requirement is a straightforward question of fact. The conduct requirement, on the other hand, is a complicated question of law and fact.

To begin, in *United States v. Bestfoods*, the Supreme Court explained that, to "operate" in the context of CERCLA, one "must manage, direct, or conduct

operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste[.]"  524 U.S. 51, 66–67 (1998).  In other words, the Court clarified, "'to operate' . . . obviously mean[s] something more than mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities."  *Id.* at 71.  Two months after *Bestfoods*, the Sixth Circuit provided the test to apply when determining whether one qualifies as a CERCLA operator. *United States v. Twp. of Brighton*, 153 F.3d 307 (6th Cir. 1998).  There, the Sixth Circuit held that the "actual control" test applies, meaning that "[b]efore one can be considered an 'operator' for CERCLA purposes, one must perform affirmative acts."  *Id.* at 314.  Thus, the Sixth Circuit found, "[t]he failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator."  *Id.*

Under that general framework, APU argues that GE qualifies as an operator of the Railcars and Yards for three reasons.  First, APU contends that GE operated the Railcars by designing and manufacturing them and, in particular, their transformers.  Second, APU argues that, by administering the Railcars' warranties at the Yards, GE controlled the Railcars enough to effectively direct the activities of the Railcars and the Yards.  Third, APU asserts GE controlled the Railcars by implementing its "fail and fix" warranty policy, under which GE chose to repair rather than replace potentially faulty transformers.  For

the following reasons, APU's first and third theories fail as matters of law, and its second theory fails on the record here.

## A. Designing and Manufacturing the Railcars Does Not Make GE an Operator.

There is no dispute that GE was the general contractor for the building of the Silverliner IV and Jersey Arrow II railcars, as well as the manufacturer of the transformers and propulsion system. GE Brief 6, ECF No. 180. APU contends that this conduct establishes that GE is an operator of the Railcars.[4] For two primary reasons, however, APU's claim fails as a matter of law. First, GE's design and manufacture activities are not the types of work that support a finding that it was an operator under CERCLA. Second, even if those actions could move the "operator" needle, GE's design and manufacturing work cannot serve as the basis for operating the Railcars because APU does not allege that any leaks occurred *at the time* GE performed that work. Thus, GE cannot be held liable as an operator for designing and manufacturing the Railcars.

Again, CERCLA defines former operators as "any person who at the time of disposal of any hazardous substance . . . operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a)(2). APU contends that GE's design and manufacture of the Railcars demonstrates its operator status as those acts related to pollution to the extent that, by including

---

[4] APU also briefly suggests that GE is liable because it invented and patented PCB-containing Pyranol. APU Brief 18, ECF No. 178. Without further developing that argument, however, the Court need not analyze it.

Pyranol and valve releases as components of the transformers, GE planned for Pyranol discharges to occur in certain *future* circumstances. Even if true, however, CERCLA does not extend liability so broadly as to attach to GE for its actions that occurred before the release of PCB-containing materials.

Acknowledging this defect, APU points to the multi-factor test of operator liability proposed in the *Brighton* concurrence, which weighed, among other things, an alleged operator's role in designing a facility and its expertise and knowledge of the dangers of a facility. APU Reply at 4, 7 (citing *Brighton*, 153 F.3d at 327 (Moore, J., concurring)). While the Court previously found these factors to be "instructive," Op. & Order 12 n.5, ECF No. 154, they are of course not binding.[5] *See Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997). Meanwhile, the majority opinion in *Brighton*—which is binding—requires that an operator "actually control" the relevant facility. *Brighton*, 153 F.3d at 314. That is, "[b]efore one can be considered an 'operator' for CERCLA purposes, one must perform affirmative acts" to control the facility, *id.*, "at the time of disposal of any hazardous substances[.]" 42 U.S.C. § 9607(a)(2). As a matter of law, then, the fact that GE designed and manufactured facilities that later released hazardous substances cannot create operator status.

APU disagrees and argues that, as a matter of law, GE's design and manufacture of the transformers is sufficient to establish operator liability

---

[5] APU does not suggest otherwise.

because the relevant product contained hazardous substances. APU offers two cases for support.

Relying on *Nu-West Mining Inc. v. United States*, 768 F. Supp. 2d 1082 (D. Idaho 2011), APU argues that operator liability can attach to the designer-manufacturer of a CERCLA facility. For several reasons, though, that case is inapposite. For one, the *Nu-West Mining* court applied a standard for operator liability that differs from the one that applies here. *Id.* at 1089. There, the court relied on the Ninth Circuit's "authority to control" standard. *Id.* (quoting *Kaiser Alum. & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341–42 (9th Cir. 1992)). Whatever the rule may be in the Ninth Circuit, the Sixth Circuit requires a CERCLA operator to exercise "actual control" over the facility that released the contamination.

Moreover, in *Nu-West Mining*, the defendant was the federal government, which had substantial control over the facilities—four hazardous waste dumps—by exerting its regulatory authority and contractual final-approval authority over the plaintiff to relocate, redesign, and (after the dumps were built) modify the four hazardous waste dumps. *Id.* at 1090–91. The government also continued to inspect the facilities "to ensure compliance with the mining plans and waste disposal guidelines." *Id.* at 1090. After those inspections, the government ordered the plaintiff to modify the facilities' structures and to stop dumping hazardous waste in certain areas, "among other decisions affecting the waste dump." *Id.* In this way, the government controlled how much, where, and the

methods by which waste could be handled by the plaintiff. *Id.* When the government later argued that it was not an operator under CERCLA but instead a typical "regulator," the court rejected that argument because, ultimately, the government "was a very active participant in designing and locating the waste dumps, in inspecting mining operations, and in ensuring compliance with all rules and plans." *Id.* at 1090–91.

Finally, in *Nu-West Mining*, the CERCLA facility the government designed, built, and monitored was a hazardous waste dump, and so, that facility was intentionally designed for the purpose of polluting. In contrast, GE designed, manufactured, and tested the Railcars—i.e., transportation vehicles, *not* waste dumps—and then delivered those Railcars to Penn Central for its commuter operations. After delivery, GE did not maintain rights to inspect the Railcars, did not have any control over how or where Penn Central operated the Railcars, and did not order Penn Central to operate the Railcars in compliance with any environmental regulations (more on all that later). Accordingly, unlike the defendant in *Nu-West*, GE's design and manufacture of the Railcars were not "specifically related to" activities involving the disposal of hazardous waste, and so GE did not participate in designing and manufacturing a facility designed specifically for the purpose of dumping hazardous materials.

Next, APU relies on *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433 (6th Cir. 2004), arguing that, there, the Sixth Circuit found the defendant was an arranger and operator under CERCLA for participating in a joint committee that approved

the design plans for the facility, as well as other projects. *Id.* at 449.  True enough, the *GenCorp* court rejected the defendant's argument that arranger and operator liability did not attach because it had not directly engaged in disposal activities.  Still, *GenCorp* does not help APU much as the Sixth Circuit in that case did not focus on the fact that the defendant had participated in the design and construction of the facility to find that those activities established the defendant was an operator.  *Id.* at 449.  Rather, the Sixth Circuit pointed out that, based on the defendant's "active interest in the facility"—as evidenced by its option to buy the plant and its contribution of one half of the facility's construction costs—and "*equal* representation" on the committee that oversaw the construction, operation, and management of the facility, the defendant had substantially controlled the facility as to justify operator/arranger liability.  *Id.* at 449 (emphasis in original).  Put differently, the defendant's role on the committee (which included overseeing the facility's design and construction, among other things), demonstrated the substantial degree of control that the defendant exerted over the entire facility.

Thus, *GenCorp* does not support APU's argument that, *inter alia*, operator liability attaches to one who designs and manufactures a vehicle that later emits a hazardous substance.  Rather, *GenCorp* focuses on whether a party actually controlled the operations specifically related to the disposal of hazardous substances at the time of those disposals.  *Id.* at 447–49.

Indeed, it is well established that simply designing and building a facility that subsequently leaks hazardous substances into the environment does not establish or otherwise support a finding of operator liability under CERCLA. Judge Easterbrook's opinion in *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155 (7th Cir. 1988), best illustrates this point. There, the Seventh Circuit explained that, because operator liability attaches only to those who control the relevant facilities at the time of the disposals, CERCLA "does not fix liability on slipshod architects, clumsy engineers, poor construction contractors, or negligent suppliers of on-the-job training—and the fact that [the defendant] might [be] all four rolled into one does not change matters." *Edward Hines*, 861 F.2d 155, 157 (7th Cir. 1988). This is true, the *Edward Hines* court found, even when—*after* the initial transaction—the designer-manufacturer-seller trains the operator-buyer to use the machinery, reserves the right to inspect ongoing operations, and furnishes the toxic materials. *Id.* at 156–57. And so, assuming as true APU's claims that GE negligently designed and manufactured poorly constructed railcars and transformers, CERCLA does not impose operator liability on such actors. Accordingly, APU cannot hold GE liable as an operator for designing and manufacturing the Silverliner IV and Jersey Arrow II railcars.

## B. Administering the Railcars' Warranties at the Yards Does Not Make GE an Operator.

Next, APU contends that GE is a CERCLA operator of the Railcars and Yards for leading the Railcars' maintenance and repair processes and ultimately

"bec[oming] ingrained in the day-to-day operations at the [Yards]." APU Brief 7, ECF No. 178. GE disagrees with that characterization of its post-sale activities, arguing that there is no evidence regarding whether GE personnel engaged in any on-site activities at the Sunnyside and Wilmington Yards, and that, to the extent GE had personnel stationed at the Paoli Yard, those technicians merely administered the Railcars' warranties, which does not involve the type of "direction" or "control" necessary to establish that GE is an operator under CERCLA. The question, then, is whether GE's post-sale activities at the Yards involved managing, directing, or conducting the Railcars and Yards.

As an initial matter, though, GE correctly points out that the record is mostly absent of evidence that GE engaged in any activities at the Sunnyside and Wilmington Yards.

Regarding the Sunnyside Yard, Evans, a former Penn Central employee, testified that he had no knowledge about whether GE had a trailer there. Evans Dep. at 161, ECF No. 130. A former GE engineer, MacMonagle, testified that he was not certain whether GE had a trailer at the Sunnyside Yard, but he believed it did. MacMonagle Dep. at 55, ECF No. 137. And Keefe, a GE field engineer, testified that GE had an office building or a part of an office building at the Sunnyside Yard from 1970 to around 1975, but he did not elaborate beyond that. Keefe Dep. at 40, ECF No. 132. Under the "actual control" standard required by *Brighton*, GE's presence at a facility undoubtedly does not establish that it operated that facility. Simply put, "existence" does not amount to "actual control."

Thus, APU has not established that GE operated the Sunnyside Yard.

By the same token, there is sparse evidence to illustrate what, if any, activities GE performed at the Wilmington Yard. Keefe testified that GE had a "commissioning site" there in the early 1970s. Keefe Dep. at 13–22, ECF No. 132. He explained that GE handled warranty support for another set of railcars (not the Silverliner IV or Jersey Arrow II Railcars) at its Wilmington Yard site, primarily "diagnosing whether the thing was functioning or defective." Id. at 22. Further, to the extent Evans testified that GE had a presence at the Wilmington Yard in the mid-1970s, he explained that it was because GE delivered the Silverliner IV cars to SEPTA there. Evans Dep. at 160–61, ECF No. 130. Neither Evans nor Keefe explained in any detail, however, the work that GE performed at the Wilmington Yard. Again, without evidence establishing that GE maintained control over the Wilmington Yard's operations, APU has not shown that operator liability should attach to GE for simply diagnosing and delivering railcars there.

That leaves the Paoli Yard. The parties do not dispute that, there, GE had a shop—better described as "a small work trailer"—from 1974 to 1978, and that four GE technicians administered the Silverliner IV railcars' warranties and taught the Penn Central employees about how to troubleshoot and repair those railcars. Id. at 155–58. But GE and APU disagree about whether those activities establish that GE operated the Railcars and the Paoli Yard. Two witnesses, one testifying on behalf of each party, explained the breakdown of duties at the Paoli Yard.

Evans was a Penn Central shop foreman there in the 1970s. Keefe was a GE technician at the Paoli Yard's shop around the same time. Their testimony is consistent.

Evans averred that at the Paoli, Wilmington, and Sunnyside Yards, Penn Central's Transportation Department managed the train schedules, staffing, equipment, and railcar inventory. *Id.* at 43, 241–44. And a Penn Central engineer "drove" the Railcars. *Id.* at 241. Meanwhile, Penn Central's Mechanical Department (of which he was a part), performed any maintenance and repairs on the Railcars. *Id.* at 241–45. Both Evans and Keefe also explained that the GE technicians at the Paoli Yard merely trained and assisted the Penn Central employees, who then maintained and repaired the Railcars. *Id.* at 152–53; Keefe Dep. 31–32, ECF No. 132. Keefe described the duties of the GE technicians working at the Paoli Yard as follows:

> In broad terms we were warranty administrators, but under the heading of warranty administrators you trained, you assisted with troubleshooting, administrative functions of doing failure analysis, determining whether it was legitimate equipment failure, whether the equipment was abused. It was a multifunctional job because there were times where I even dispatched people to go out and ride the equipment to find out what the railroad was complaining about. That was essentially it.

Keefe Dep. 31–32, ECF No. 132.

Evans' testimony substantiates Keefe's and further explains that the GE technicians could only offer advice to Penn Central employees about identifying a Railcar's issues. In other words, the GE technicians were only allowed to

recommend methods to repair a Railcar's problems, given that Penn Central's

shop foreman had *exclusive* authority over the railroad employees' actions as

they performed maintenance and repairs on the Railcars.  Evans Dep. 162–63,

ECF No. 130.  Here is how Evans explained the division of authority for the Paoli

Yard's maintenance operations:

> Q:    Now, was there a particular protocol that needed to be followed when Paoli employees of Penn Central communicated with the guys in the GE trailer? I mean, did they have to go through a particular supervisor, or could kind of anyone walk in and talk to the guys?
>
> A:    The shop manager handled that, the manager of the shop.
>
> Q:    So that would have been the position you had?
>
> A:    My position, or somebody under me in a management position, would say, I need some assistance on such-and-such a project, or tell them that a car's coming in, it's got a warranty problem.
>
> Q:    So essentially it had to be authorized by the shop foreman?
>
> A:    Yes.
>
>        …
>
> Q:    Were the GE employees who staffed the trailer allowed to give orders to the railroad employees?
>
> A:    No.
>
> Q:    What would have happened if they had tried to give orders to the railroad employees?
>
> A:    They did – they didn't try to give orders to the railroad employees because they knew the ground rules when they came there. They were the technicians, and . . . if any orders were to be given out, it would be given out by the [the railroad's] foreman.

*Id.* Not only this, but Penn Central's union labor rules required that Penn Central employees actually repair and perform maintenance on the Railcars. *Id.* at 167–68.

And the purchase agreements under which GE sold the Railcars clearly state that GE was a contractor. Unlike the defendant in *GenCorp*, GE had no interest in the facility (i.e., had no right to share in the profits and was not required to contribute to the operational losses, or any other operational expense, beyond those called for in the warranty agreement). Notably, APU has not presented any cases in which a court has held a party liable for administering its warranty obligations. And APU has not explained how administering the Railcars' warranties amounts to operating the railcars. To the contrary, replacing parts of the Railcars in accordance with the warranty agreement at an off-site location suggests that the Railcars were *not* operating during those activities. Plus, according to Evans, in any instance where a transformer was leaking, GE employees were not around to provide advice about fixing the unit. *Id.* at 236.

Consistent with the Warranty Agreements, GE presents a document that lists the activities that the GE warranty administrators performed:

    a.) On-the-job training of the railroad personnel

    b.) Technical assistance to railroad personnel

    c.) Assistance with troubleshooting the Railcars when:

        i.    a Railcar's problems were complex or beyond the capability
              of the Penn Central personnel to diagnose and correct

  ii.  GE personnel had not yet taught Penn Central personnel the necessary troubleshooting methods in formal or on-the-job training

  iii.  a Railcar had a repeated issue and Penn Central personnel were unable to diagnose and correct the problem

 d.) Administering the warranty

GE Brief, Ex. 22 at 2, ECF No. 180-22.  That document also states that "GE can not perform routine troubleshooting of [Rail]cars or try to run the [Penn Central] maintenance facilities."  *Id.*

  Based on this procedure, then, GE did not know about any problems with a Railcar's transformer until after Penn Central had tried and failed to fix the transformer or Penn Central had otherwise sought a GE employee's technical guidance.

  In the event one of the Railcars had a problem, Penn Central had the ability to initiate a claim.  GE Brief Ex. 16 at 9, ECF No. 180-16.  If Penn Central initiated a claim, it could elect one of three options: (1) exchange the failed unit for a new one, (2) have GE rebuild the failed unit, or (3) pursue a "limited repair and return" option.  *Id.* at 10–11.  If Penn Central chose either the second or third option, a GE technician would decide to either pay Penn Central to perform the work or elect for GE to perform the work itself at a GE shop elsewhere.  *Id.*  The on-site GE employees never actually physically repaired or serviced the equipment.  Evans Dep. at 232, ECF No. 180-1.  And if a Penn Central employee

or supervisor disagreed with a GE employee's advice, the Penn Central employees were free to disregard it. *Id.* 235.

APU points to *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486 (S.D. Texas 2015) for the proposition that an entity can be held liable as a former CERCLA operator if that entity approved designs for a facility, permanently stationed personnel there, and played a substantial role in day-to-day operations of the facility. In *Exxon*, the plaintiff moved for summary judgment to determine the government's culpability under CERCLA for its involvement at two different types of facilities: refineries and plants. As to the plants, the court concluded that the government, which had already admitted CERCLA liability as an owner of those facilities, was also an operator under CERCLA because the government had a substantial presence at the facility and final approval for, among other things, expenditures exceeding $1,000; the disposal of waste; additions and alterations to the plant; and increasing Exxon employees' salaries and benefits. *Id.* at 531. GE had no such control at the Paoli Yard. Plus, the extent of GE's presence at the Paoli Yard—a four-employee work trailer—pales in comparison to the government's operations at the plants in *Exxon*. There, at just one of the plants, the government "featured military barracks, a mess hall, air raid shelters, high-security perimeter fencing, and four guard watchtowers." *Exxon*, 108 F. Supp. 3d at 532. The *Exxon* court thus concluded that the plant "resembled a United States Army base more than a chemical plant." *Id.* And so, *Exxon* does not alter the Court's analysis of GE's work trailer here.

The *Exxon* court's analysis of the refineries in that case provide even more support that GE was not an operator in this case.  That court concluded that the government was not a former operator because—although the government stationed at least one employee at one of the refineries to ensure product quality and coordinate shipping—there was no evidence that the government was involved in the refineries' daily management or waste disposal practices.  *Id.* at 526.  Notably, the *Exxon* court emphasized, the government was not authorized to hire, fire, or in any way manage Exxon's refinery employees.  *Id.*  Without such control, and even though the government understood the potential for harmful pollution at the facilities, the government did not operate those facilities.  *Id.* at 529.

Similarly here, GE had no control over Penn Central's employees and certainly not over the entire Paoli Yard.  Rather, as explained above, the GE technicians could only recommend troubleshooting and repair advice.  In contrast, Penn Central's Transportation Department determined the staffing decisions, equipment to be used, services to be offered, commuter schedules, and railcar inventory.  Evans Dep. 240–42, ECF No. 180-1.  And Penn Central's Mechanical Department performed all hands-on maintenance and repairs.  *Id.* at 232.  Meanwhile, GE technicians proposed maintenance schedules for the Railcars, which Penn Central generally accepted and followed.  *Id.* at 244.  Similarly, GE technicians could recommend—but not order—that Penn Central remove a malfunctioning Railcar.  *Id.* at 245.

GE's advisory role in the Railcars' operation, as opposed to a management or control position, leads to the conclusion that GE did not operate the Paoli Yard or the Railcars.

## C. The "Fail And Fix" Policy Does Not Render GE a CERCLA Operator.

Finally, APU contends that GE operated the Railcars by implementing a "fail and fix" policy, which refers to GE's decision not to proactively recall and replace transformers under warranty that had not failed but also could not be definitely declared defect-free. But even under APU's characterization, as GE points out, that policy would amount to a *failure* to exercise control over the Railcars, which cannot be the basis for operator liability. *See Brighton*, 153 F.3d at 314 ("Before one can be considered an 'operator' for CERCLA purposes, one must perform affirmative acts. The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator."). Thus, APU's argument relating to GE's "fail and fix" policy fails as a matter of law.

## IV. CONCLUSION

For these reasons, the Court finds that the record evidence establishes that GE is not a CERCLA operator of the Paoli, Sunnyside, or Wilmington Yards, or the Silverliner IV or Jersey Arrow II railcars. Therefore, the Court **DIRECTS** the Clerk to enter judgment in favor of GE and **TERMINATE** this case.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**